Argued and submitted October 22, 1998, affirmed March 17, 1999

James M. KRAEMER,
*Respondent,*

*v.*

Jeffrey M. HARDING,
Patricia A. Harding, John Lundberg and
Janet Lundberg,
*Appellants.*

(941891; CA A97884)

976 P2d 1160

Kim E. Hoyt argued the cause for appellants. With her on the briefs was Ferder, Brandt, Casebeer, Cooper, Hoyt & French, LLP.

Edward J. Harri argued the cause for respondent. With him on the brief were James C. Egan, and Emmons, Kropp, Kryger, Alexander, Egan & Elmer, P. C.

Before Edmonds, Presiding Judge, and Deits, Chief Judge,* and Linder, Judge.

EDMONDS, P. J.

---

\* Deits, C. J., *vice* Warren, P. J., retired.

## EDMONDS, P. J.

Defendants appeal from a judgment in favor of plaintiff on his claims for defamation, intentional interference with economic relations and intentional infliction of emotional distress. They assign error to the trial court's denial of their motion for a directed verdict on each claim, its submission of the punitive damages issue to the jury, its instructions to the jury on that issue and its failure to reduce the punitive damage award. We affirm.

We state the evidence introduced at trial in the light most favorable to plaintiff. *See Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984). During the 1992-93 school year, plaintiff was employed by the Lebanon school district as a bus driver on the route that served defendants' children. Defendants Janet Lundberg (Mrs. Lundberg), Jonathan Lundberg (Mr. Lundberg), and Patricia Harding (Dr. Harding) testified that their children complained about plaintiff almost every day. Mrs. Lundberg spoke with other mothers who had children on plaintiff's route and learned that their children had similar complaints. According to Mrs. Lundberg, she learned that plaintiff had kept another mother's fifth-grade daughter on the bus after it had arrived at the grade school "to say hi" or "to get to know her better." Plaintiff testified that, between November 1992 and February 1993, a disagreement arose between him and Mr. and Mrs. Lundberg regarding where one of the Lundberg children could be picked up if he missed the bus at his designated stop. Dr. Harding testified that her "oldest son * * * had trouble [with plaintiff] about every two weeks." At some point, Mrs. Lundberg also shared with Dr. Harding the information about the fifth-grade girl. Dr. Harding testified that she believed that it was "our civic duty to go down and tell the school the things we had heard." Mr. and Mrs. Lundberg testified that they knew that plaintiff had an economic relationship with the school district but that it did not matter to them whether he was terminated from his job if that was what was required to remove him from the bus route. Jeffrey Harding (Mr. Harding) also testified that he knew that plaintiff was an employee of the district and that "[i]t was not [his] concern how [plaintiff] was taken off the route."

Initially, defendants shared their concerns about plaintiff at a meeting on February 8, 1993, with plaintiff, Gerald McVein, the district's Director of Transportation at that time, and Stephen Williams, the district's Director of Personnel and Curriculum at that time. Retha Larson, plaintiff's union representative, also attended. Dr. Harding testified that, at the meeting, she disclosed the "report that [Mrs. Lundberg] had told [her] of a little girl that [plaintiff] had kept * * * after the bus had stopped at Green Acres and he made her stay on the bus[;] it was the report that he wanted to get to know her." McVein testified that he took that statement seriously. On redirect examination, he indicated "that [Dr. Harding's statement] implied that [plaintiff] was having inappropriate contact with young girls" and that "it could be sexual." Williams also inferred that Dr. Harding had alleged "that perhaps [plaintiff] was doing this for reasons that would not be appropriate, for reasons perhaps to get to know this child, so [as] maybe to perpetrate something later" such as "something sexual, violence." Larson testified that, at the end of that meeting, defendants appeared frustrated and indicated "that they had hearsay [regarding the report], but didn't really have any warrant * * * for knowing whether [it was] fact or not." After the meeting, Williams undertook to investigate the information that he had been given at the meeting. He contacted the mother of the fifth-grade girl, but he did not remove plaintiff from the route as a result of his investigation.

On June 3, 1993, Mr. Harding filed a written complaint about plaintiff with the district. The complaint stated:

> "The bus driver serving the route that includes Griggs Drive, taking children to Green Acres and LMS shows very poor judgment. His petty tyranny makes it very difficult for my son * * * to ride the bus. He threatens to 'write up' children for the least of infractions, and seems unable to maintain disciplin[e] on the bus without such measures as requiring siblings to sit together, particular rules about foot placement and posture, and many others I am not familiar with.

> "His job is to drive the children to and from school. Other drivers seem to be able to do it without such intense involvement with particulars of the children's behavior, yet

this driver does not seem to be able to. Our route is a particularly long one, requiring more than an hour. Surely a driver could be found who would not make the trip such an ordeal."

Mr. Harding requested that plaintiff not "drive the bus serving [Mr. Harding's] children." Approximately a week later, a letter was filed regarding an incident where one of Dr. and Mr. Harding's sons had left the bus in frustration far from his home. McVein investigated and concluded, in part, that plaintiff had "not violated State or District policies regarding his actions with students." Subsequently, Dr. Harding responded to McVein's conclusion in a letter to McVein:

"I want it made clear that if [plaintiff] drives my children[']s bus in the fall I will not wait 6 months to 'see what happens.' I will actively get parental complaints, hold group meetings, etc, until the situation is remedied, [i.e., plaintiff] is off our route. I will not subject my children to this belittling subjugation [and] threats for another year."

On September 13, 1993, Mr. Harding resubmitted the written complaint to the district superintendent, Ivan Launstein. Apparently on the same day, Dr. Harding wrote a note to district officials.[1] The note stated, in its entirety: "Please have [our daughter] get off with the Lundberg children on the days that one of her brothers cannot accompany her home." Launstein investigated and prepared a written report of his findings. The report names Mr. Harding as the complainant and includes allegations that plaintiff had "held a female student on the bus at Green Acres School after the other students had exited, to get to know her," that "the mother of [that] student * * * is reported to be concerned each morning that [plaintiff] will just drive off with her children" and that plaintiff had "pushed a female student up against

---

[1] With regard to the note, Dr. Harding testified:

"We tried to talk [our daughter] into [s]occer practice, we tried to talk her into anything, but she wanted to ride the bus home. I couldn't, not with two girls, I couldn't let her be the last child off, I couldn't do that. And you could say, 'Well did you really think he would hurt her?' My gosh, if there was even a small, small possibility I couldn't, I couldn't do that. I couldn't, I couldn't let her ride the bus with him alone. What would you tell the police if something happened and they said, 'Well you mean you kind of thought this might happen and you had made these complaints?' I'm sure the police would say, 'Are you crazy?' "

the wall." Launstein concluded after investigating the complaint that there was "no proof or indication that [plaintiff had] done anything inappropriate with any students (boys or girls)." Plaintiff remained on the route. Mr. Harding then requested a meeting with the school board about the matter.

In October 1993, the school board considered Mr. Harding's written complaint during an executive session. Dr. and Mr. Harding, plaintiff, Larson, Williams, Launstein and the school board members attended. Williams testified at trial that Dr. Harding "indicated [at the meeting] that there were two girls that, little girls that she said [plaintiff] accosted last year and that he had sat with one, must have talked with her I assume, but she did indicate that he didn't touch her."[2]

Launstein initially testified that he could not recall that Dr. Harding said anything at the meeting from which he inferred that her complaint against plaintiff was one involving sexual abuse. However, on recross-examination, the following exchange took place regarding Launstein's investigation:

---

[2] Dr. Harding's explanation for her reference to two girls occurred in the following exchange during her direct testimony:

"Q. Now much has been made out of the fact that you wrote [the letter regarding your daughter] the day that Mr. Harding signed the complaint. Why did you do this?

"A. What happened was that I have Mondays off and Monday I was in Safeway checking out and I had, was writing my check and Amanda Anderson, that's Mrs. Anderson * * * came up to me and said something like, 'Well, we've got him back,' or 'same bus driver this year.' And then she said something, 'Well after he did what he did to my daughter I didn't think he would be back.' And she said something about how he sat down with her and pushed her up against the window, something to that effect. And I said to her, 'Oh, so it was your daughter.' I never knew whose daughter it was, [Mrs. Lundberg] would never tell me.

"Q. When you said, 'So it was your daughter,' did you think she was referring to [the fifth-grade girl]?

"A. I thought she was [the fifth-grade girl] and so I didn't ask her anything more about it. I was leaving Safeway, I put my groceries in the car and went home. Later on I talked to [Mrs.] Lundberg and among many other things I said, 'Oh, by the way, I know who the other girl is,' and because I thought [Mrs. Lundberg] thought I didn't know the parent of the other girl and I've known Amanda. And then she said, 'Oh no, that's not the same girl.'

"Q. And was that the first time you knew we were talking about two girls?

"A. Then we were talking about two girls."

"Q. Nevertheless, you completed an investigation to ensure [plaintiff] was not a predator, correct?

"A. Correct.

"Q. That was based on the allegations made by Dr. and Mr. Harding?

"A. By the question raised by Dr. and Mr. Harding.

"Q. And if somebody told you that a bus driver was accosting little girls on the school bus, what conclusion would you draw from that accusation?

"A. Well first I would conclude that I had better immediately check into it and find out what in fact is happening.

"Q. And in fact if there was any substantial evidence * * * to indicate that that was taking place, you'd turn it into [Children's Services Division] in a heartbeat wouldn't you?

"A. Yes, I would."

Dr. Harding's testimony on direct examination regarding the October school board meeting was as follows:

"Q. And at the October 11th board meeting, what did you say to the school board?

"A. * * * And at the very end of it, the very end I also said, 'And then there are these two girls incidents,' and I told them exactly what I knew, nothing more.

"Q. Did you use the word 'accosted?'

"A. I might have, but I explained the whole situation afterwards so I didn't stand up and say, 'He accosted them,' and sat down and quit talking, I explained what I meant by 'accosted.' I would have said there was one little girl who when the bus stopped at Green Acres that the rest of the kids got off and she was made to stay with the idea that he wanted to get to know her and there was another little girl that he sat down with and made her feel uncomfortable * * * to the point where she felt like she was wedged up against the window, and that's what I said. If I said 'accosted,' I explained what I meant.

"Q. And did you explain how that information came to you?

"A. Yes.

"Q. And what did you tell them? How did it come to you?

"A. I would have said that one came from [Mrs.] Anderson and the other one came from Mrs. Nichols. By that point, I had talked to Mrs. Nichols."

Dr. Harding's testimony regarding whether she had made a report of sexual abuse to the appropriate state agency was as follows:

"Q. If you thought someone was a sexual molester — let me back up, what is your profession?

"A. I'm a physician. I deal in family practice where we deal with * * * newborns all the way to old people.

"Q. And if you believed someone was a sexual molester, a predator of small children, what would you be required to do?

"A. I'm required and have reported this to CSD in my —.

"Q. Did you report it in this case?

"A. No.

"Q. Did you think you had enough to do that?

"A. No.

"Q. Did you expect the school board to think that you had enough to —

"A. No.

"Q. — to even suggest this man was a sexual predator?

"A. No."[3]

---

[3] During the period of February 1993 to October 1993, ORS 418.750 (1991) provided, in part:

"Any public or private official having reasonable cause to believe that any child with whom the official *comes in contact in an official capacity* has suffered abuse, or that any person with whom the official *comes in contact in an official capacity* has abused a child shall report or cause a report to be made in the manner required in ORS 418.755. * * *" (Emphasis added.)

That statute was repealed by Oregon Laws 1993, chapter 546, section 141. ORS 419B.010(1) now provides, in part:

"Any public or private official having reasonable cause to believe that any child with whom the official *comes in contact* has suffered abuse or that any person with whom the official *comes in contact* has abused a child

Art Messmer, one of the school board members in attendance, testified that he recalled "out of the whole thing * * * an accusation made in regard to sexual molesting children." On cross-examination, he said:

"Q. And you're saying Dr. Harding specifically used words that Mr. Kraemer was sexually molesting girls?

"A. I believe the accusation was that they had a fear of he was molesting.

"Q. Those were the words they used?

"A. Molesting children, yes. There was a lot of evidence that was brought forth. Picture taking, he was taking pictures of kids.

"Q. Mr. Messmer, I understand there were lots of things that they brought up that they had questions about [plaintiff's] conduct, my question is did they physically use the words that he was sexually molesting children?

"A. I believe it was, yes.

"Q. Those were the specific words?

"A. Yes."

The record is not entirely clear what action, if any, the school board took after the meeting. Plaintiff remained on the bus route. On October 12, 1993, Launstein issued a memorandum to McVein that provided:

"To assist [plaintiff] in his performance as a bus driver, I am directing you to assist [plaintiff] in the following areas:

"(1) [Plaintiff] is to be very clear in communicating to students when they are receiving a warning and when they are receiving a referral. If students are informed they will receive a referral, then a referral will be written unless there is good reason to do otherwise in which case that will be communicated to the affected student.

---

shall immediately report or cause a report to be made in the manner required in ORS 419B.015. * * *" (Emphasis added.)

That statute was enacted in 1993 and became effective on November 4, 1993. Or Laws 1993, ch 546, § 14.

"(2) [Plaintiff] is to use extreme care to ensure that all students departing the bus are accounted prior to engaging the bus.

"(3) [Plaintiff] is directed to account for the number, time and reasons for pulling the bus off the road. The Supervisor of Transportation will judge the appropriateness of the action.

"(4) [Plaintiff] is to use care in leaving stops if there is a question that a student may be enroute to the bus. If the student is visible and moving toward the bus, the bus is to wait for the student.

"(5) [Plaintiff] is to exercise great care in gaining all of the details prior to taking disciplinary action."

When the Lundbergs learned that plaintiff was still on the bus route, they sent a letter to McVein indicating that they too were filing a complaint against plaintiff. Also, according to Mrs. Lundberg, she was involved in circulating a petition in the neighborhood during October asking that plaintiff be removed as their bus driver. In addition, Mr. Harding wrote a letter[4] to Launstein dated October 25, 1993, that stated, in part:

"You report that the girl told you that she was held with 'two other kids or [her] brother' but fail to report that when you discussed your conversation with her mother, she told you in no uncertain terms that that was not the story her daughter told her at the time. How can you place greater reliance on what a fifth grade girl told you, more than half a year after the fact, than what she told her mother at the time? You conclude that there is no indication that [plaintiff] has done anything inappropriate. I submit that holding a girl back when all the other students left the bus *is* inappropriate, and there is a *clear* indication that he did it.

"By reporting that the girl told you in the fall that she was not alone and failing to report that her mother insists she told her a different story the winter before, you have misrepresented the facts to the school boards. If you are

---

[1] A stamp on the exhibit indicates that it was apparently received by Launstein on October 26, 1993. According to plaintiff, he did not know about Mr. Harding's letter until 1994, when it was released during the discovery process of a workers' compensation claim that plaintiff filed.

willing to misrepresent the facts on this issue, how can you expect the school boards to trust your reports in the future?

"* * * * *

"* * * But in any case, we haven't asked that he be disciplined, only reassigned, and the 16c School Board instructed you to do so. That action is within your power as supervisor of the 16c District. I note, as you have, that the UH1 School Board did not pass the motion requesting that you reassign [plaintiff]. But the UH1 Board did not give you instructions to ignore the request of the 16c Board. They gave you no instructions. Given their silence, you should follow the instructions of the 16c Board." (Emphasis in original.)

Finally, a November 18, 1993, letter from McVein to Mr. and Mrs. Lundberg indicates that plaintiff had "been permanently assigned to a different bus route as of November 5, 1993."

Plaintiff testified that he became so preoccupied with the accusations made by defendants that he had trouble concentrating and felt depressed and upset. In November 1993, he consulted his physician, who diagnosed him with an acute adjustment reaction with features of anxiety and depression. The physician testified that plaintiff was

"describing symptoms suggestive of an acute adjustment reaction just the stress that he was under and he looked like he was somebody who was under a great deal of stress, he was fidgeting and looked anxious and somewhat irritable and he was describing symptoms that would be consistent with that, difficulty paying attention, difficulty sleeping, other physical symptoms, headaches, bowel trouble, things like that."

Plaintiff was relieved from his work by the physician in the fall of 1993 and continued thereafter under medical treatment. Plaintiff also saw a psychiatrist. After the physician declared plaintiff medically stationary in August 1994, plaintiff returned to driving a regular route that fall.

In October 1994, plaintiff filed a complaint for damages in circuit court against defendants for defamation, intentional interference with economic relations and intentional infliction of emotional distress. Defendants moved to

dismiss the defamation claim on the ground that it was barred by the one-year statute of limitations, ORS 12.120. That motion was granted. The court thereafter allowed the filing of a second amended complaint. That complaint alleges, in part:

> "Beginning on or about February 8, 1993, the defendants, and each of them, began communicating with plaintiff's employer both verbally and in writing, alleging misconduct by plaintiff. In their allegations against plaintiff, defendants, and each of them, made statements which they knew were untrue. Specifically these statements were:
>
> "(a) plaintiff had initiated contact with a fifth-grade student passenger for the purpose of initiating a sexual relationship;
>
> "(b) plaintiff had driven his bus dangerously and had endangered the safety of their children; and
>
> "(c) plaintiff was an incompetent bus driver.
>
> "These statements by defendants, and each of them, were part of an ongoing course of conduct including written and verbal accusations against plaintiff. These accusations were made to plaintiff's supervisors and to the Lebanon School Board, a public entity. The ongoing course of conduct of defendants included written complaints published to the school board and allegations printed in the community newspaper. This ongoing course of conduct of defendants, and each of them, continued up to and beyond October 25, 1993, when defendant, Jeffrey Harding, sent a letter to [a] Lebanon School District official repeating the false accusations against plaintiff. The October 25, 1993, letter from defendant was received by the school district on October 26, 1993, and was not made known to plaintiff, James Kraemer, until May 5, 1994."

The second amended complaint further alleges, in the context of the defamation claim:

> "Defendants, each of them, continued to make statements as set forth above or endorsed statements, as set forth above, through October 25, 1993, which statements were discovered by plaintiff on or about May 5, 1994."

Defendants filed their answer denying "that they ever specifically stated that the plaintiff had initiated contact

with a fifth-grade student for the purpose of initiating a sexual relationship." They admitted that "in their opinion plaintiff had driven the bus dangerously and had endangered the safety of their children and was an incompetent bus driver." As a defense, defendants alleged that "[a]ll statements of fact made by defendants were true" and that their reports to school district officials were privileged. They also raised statute of limitations arguments with regard to the defamation and intentional interference with economic relations claims.[5] The case proceeded to trial.

At the close of plaintiff's case-in-chief, defendants moved for a directed verdict on each claim. The motions were renewed at the close of all of the evidence. Defendants argued that they were entitled to a directed verdict on the defamation claim because their communications were statements of concern or opinion based on hearsay and not statements of fact. They also contended that their communications were privileged and that there was no evidence that plaintiff's reputation had been damaged. Additionally, defendants asserted that the defamation claim was barred by the statute of limitations. They also argued that they were entitled to a directed verdict on the claim of intentional interference with economic relations on the grounds that defendants were not "strangers" to the contract and that defendants did not interfere through an improper means or for an improper purpose.[6] Finally, with regard to the claim for intentional infliction of emotional distress, defendants contended that a directed verdict would have been proper because they had not acted with the requisite intent, their conduct was not an extraordinary transgression of socially tolerable conduct and plaintiff had not suffered severe emotional distress.

The trial court denied all of the motions for directed verdicts and submitted plaintiff's claims to the jury.[7] The jury

---

[5] During defendants' motion for a directed verdict, their attorney conceded that plaintiff's intentional interference with economic relations claim was filed within the two-year statute of limitations. ORS 12.110.

[6] On appeal, defendants argue only that there is no evidence that they acted through an improper means or with an improper motive.

[7] The jury completed a special verdict form for each defendant. However, there were no motions made during the trial that, if granted, would have resulted in the dismissal of fewer than all defendants from the case.

returned a verdict against each defendant and in favor of plaintiff in the amount of $5,387.27 in economic damages, $127,500 in noneconomic damages and $75,000 in punitive damages. Defendants appeal from the resulting judgment.

On appeal, defendants assert in their first three assignments of error that the trial court erred by denying their motions for a directed verdict, judgment notwithstanding the verdict and a new trial on each of plaintiff's claims. We turn first to the trial court's denial of the directed verdict motion on the defamation claim. An action for defamation must be commenced within one year. ORS 12.120. In *Schenck v. Oregon Television, Inc.*, 146 Or App 430, 435, 934 P2d 480 (1997), we held:

> "The gravamen of the tort of defamation is the injury to the plaintiff's reputation caused by a statement communicated to someone other than to the plaintiff. *Shirley v. Freunscht*, 303 Or 234, 238, 735 P2d 600 (1987) (citing to *Lowe v. Brown*, 114 Or 426, 433-34, 233 P 272, 235 P 395 (1925); *State v. Mason*, 26 Or 273, 277-78, 38 P 130 (1894), and Prosser and Keeton, *The Law of Torts* 771, § 111 (5th ed 1984)). Under this definition, each publication is a discrete tort, because a new injury could occur upon each publication."

Plaintiff's complaint was filed on October 25, 1994. The consistent theme running through plaintiff's treatment of the statute of limitations issue in an effort to avoid the effect of ORS 12.120 is that Mr. Harding's October 25, 1993, letter was part of an ongoing course of conduct that began with the February 8, 1993, meeting and "represented a republication of the matters that had already been the subject of the school board's investigation." The trial court ruled:

> "Whether or not originally what was said was defamatory, what the jury infers from what was said is defamatory, that started at the first meeting, as I recall his testimony, when [Dr.] Harding made the statement. That statement or similar statements were otherwise made, but the point is that that same theme is carried out in [the October 25, 1993, letter] and I'm going along with the argument that once that statement is made to carry on, whether you say exactly the same words that carry on the theme is sufficient and this is

a republication because it is another statement to a person other than the Plaintiff."

The trial court's reasoning is erroneous under *Schenck*. Each publication of a defamatory statement is a discrete tort for which the publisher may be subject to liability. The statute of limitations on each statement made before October 25, 1994, started running on the date that it was made. The one-year period as to each statement expired before plaintiff filed his complaint. Thus, the trial court erred in denying the motion for a directed verdict on plaintiff's defamation claim.[8]

■■ Next, we turn to defendants' assignment of error regarding the denial of their motion for a directed verdict on the intentional interference with economic relations claim. The tort of intentional interference with economic relations consists of six elements:

"(1) the existence of a professional or business relationship (which could include, *e.g.*, a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages." *McGanty v. Staudenraus*, 321 Or 532, 535, 901 P2d 841 (1995).

Defendants argue that they acted out of concern for the safety of their children and that, therefore, there is no evidence that they acted through an improper means or with an improper motive.[9] In *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or 201, 209-10, 582 P2d 1365 (1978), the court explained the concept embodied in the fourth element of the tort:

"In summary, such a claim is made out when interference resulting in injury to another is wrongful by some measure

---

[8] Plaintiff did not argue to the trial court that the October 25, 1993, letter to Launstein constituted a discrete tort, and we render no opinion on that issue.

[9] Defendants also assign error to the denial of their motion for a judgment notwithstanding the verdict and a new trial based on the same issue. However, because the "denials of those motions made on the grounds of insufficiency of evidence are not reviewable," *Burke v. American Network, Inc.*, 95 Or App 274, 277, 768 P2d 924 (1989), we decline to address them.

beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means. They may be wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession." (Footnote omitted.)

Elaborating on the concept that an interference may be wrongful under a recognized rule of common law, the court indicated that "[c]ommonly included among improper means are violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, *defamation* or disparaging falsehood." *Top Service Body Shop*, 283 Or at 210 n 11 (emphasis added).

■ Plaintiff's theory is that defendants' publication of false, defamatory statements constituted the required "improper means." A statement is defamatory if it would subject an individual to:

> " 'hatred, contempt or ridicule * * * [or] tend to diminish the esteem, respect, goodwill or confidence in which each is held or to excite adverse, derogatory or unpleasant feelings or opinions against [him].' " *King v. Menolascino*, 276 Or 501, 504, 555 P2d 442 (1976) (quoting *Farnsworth v. Hyde*, 266 Or 236, 238, 512 P2d 1003 (1973)) (bracketed material in original). *Accord Reesman v. Highfill*, 327 Or 597, 603, 965 P2d 1030 (1998).

Even though the one-year statute of limitations, ORS 12.120, operates to ban plaintiff's claim for defamation, it has no effect on plaintiff's claim for intentional interference with economic relations, which is governed by ORS 12.110(1). *See Top Service Body Shop*, 283 Or at 210 n 11 (reasoning that "in a claim of improper interference with plaintiff's contractual relations, it is not necessary to prove all the elements of liability for another tort if those elements that pertain to the defendant's conduct are present").

■ Based on the evidence, the jury could have inferred that defendants published to the school board during the October 1993 executive session the false statement that plaintiff was sexually molesting students, even though they knew that an investigation of their claims had found that no inappropriate conduct had occurred. Such a statement would

constitute an "improper means" because it is an actionable defamation. *See Milkovich v. Lorain Journal Co.*, 497 US 1, 19-20, 110 S Ct 2695, 111 L Ed 2d 1 (1990) (holding that, to be actionable, a declarant's statement must be provable as false); *see also Reesman*, 327 Or at 606 (holding that, for purposes of the law of defamation, statements that can be interpreted reasonably as stating actual facts are not "opinions" that otherwise would be immune from liability). Because the jury could have inferred that defendants published false defamatory statements to interfere with plaintiff's employment relationship, defendants are liable for damages caused by their statements unless they were privileged.

■　　Regarding the question of privilege, the court stated in *Wallulis v. Dymowski*, 323 Or 337, 348-49, 918 P2d 755 (1996):

> "This court previously has stated that 'the question of whether or not a defamatory statement is privileged, either absolutely or conditionally, depends upon the balance that the court strikes between competing interests.' *Lee v. Paulsen*, 273 Or 103, 105, 539 P2d 1079 (1975). Heretofore Oregon has recognized only a handful of situations in which defamatory statements are absolutely privileged. *See Grubb v. Johnson et al*, 205 Or 624, 631, 289 P2d 1067 (1955) ('[t]he class of absolutely privileged communications is narrow and is practically limited to legislative and judicial proceedings and other acts of state' (internal quotation marks omitted)).

> "First, statements that are made as part of judicial and quasi-judicial proceedings are absolutely privileged. *See, e.g., Ducosin v. Mott*, 292 Or 764, 768, 770, 642 P2d 1168 (1982) (communications to a medical examiner suggesting a possible homicide should be 'cloaked with an absolute privilege,' because those communications are 'an initial step in a judicial proceeding' (internal quotation marks omitted)); *Binder v. Oregon Bank*, 284 Or 89, 91, 585 P2d 655 (1978) ('[s]tatements made by parties to judicial proceedings are absolutely privileged'); *Moore [v. West Lawn Mem'l Park]*, 266 Or [244,] 250-51[, 512 P2d 1344 (1973)] (communications made to State Board of Funeral Directors and Embalmers, when that Board is sitting in its quasi-judicial function as a licensing body, are absolutely privileged); *Ramstead v. Morgan*, 219 Or 383, 401, 347 P2d 594 (1959)

(absolute privilege attached to former client's statements to a State Bar committee concerning alleged attorney misconduct, because Bar committee was serving a judicial or quasi-judicial function). Similarly, statements made as part of a legislator's legislative duties are absolutely privileged. *See, e.g., Noble v. Ternyik*, 273 Or 39, 41-45, 539 P2d 658 (1975) (recognizing an absolute privilege for state legislators and members of 'lesser legislative bodies' for 'statements, made in the course of their legislative duties').

"In addition, this court has held that 'there is an absolute privilege for publications that are consented to.' *Lee*, 273 Or at 105. That rule applies even when the allegedly defamed person did not consent to the exact words that are published, as long as the person 'had reason to believe the [consented to] publication would be defamatory.' *Christensen v. Marvin*, 273 Or 97, 102, 539 P2d 1082 (1975). * * *

"*Christensen* suggested that a third situation gives rise to an absolute privilege — when statements are made to carry out a statutory requirement. *See* 273 Or at 100 ('We are further influenced in this particular case to [hold that the alleged defamatory statements are absolutely privileged] because the defendant board members published the reasons for their failure to rehire the plaintiff because they were required to by statute.')." (Bracketed material in original; bracketed citation added.)

In this case, the school board held an executive session hearing based on complaints by defendants, who wanted the board to remove plaintiff from driving the bus route that served their children. Although Williams testified that

"it was a hearing in which [plaintiff] and the association called some witnesses to testify and [Dr. and Mr.] Harding spoke about their complaint or * * * explained their complaint to the Board and Mr. Launstein would have explained what he had done to that point[,]"

the meeting was not the type of occasion that falls within any of the recognized situations described in *Wallulis* where an absolute privilege is held to exist.

■ With regard to a conditional privilege, the Supreme Court has said:

"A statement is conditionally privileged if: (1) it was made to protect the interests of defendants; (2) it was made to protect the interests of plaintiff's employer; or (3) it was on a subject of mutual concern to defendants and the persons to whom the statement was made." *Wattenburg v. United Medical Lab.*, 269 Or 377, 380, 525 P2d 113 (1974).

■ However, such a privilege

"may be lost if the speaker does not believe that the statement is true or lacks reasonable grounds to believe that it is true; if it is published for a purpose other than that for which the particular privilege is given; if the publication is made to some person not reasonably believed to be necessary to accomplish the purpose; or if the publication includes [a] defamatory matter not reasonably believed to be necessary to accomplish the purpose." *Lund v. Arbonne International, Inc.*, 132 Or App 87, 96, 887 P2d 817 (1994).

■ In this case, there was evidence from which the jury could have inferred that defendants did not believe or lacked reasonable grounds to believe that the accusation about sexual molestation was true. Before the school board meeting where Dr. Harding raised the allegations about the "two girls," Williams, McVein and Launstein had all completed investigations of defendants' complaints. Williams had contacted the fifth-grade girl's mother based on defendants' report and had not removed plaintiff from the bus route as a result of his investigation. Four months later, Mr. Harding filed a written complaint with McVein that contained no allegations of a sexual nature. When McVein's resolution of that complaint was unsatisfactory to defendants, Harding took the complaint to Launstein and reasserted the sexual allegations. Even though Launstein's investigation found that there was "no proof or indication that [plaintiff had] done anything inappropriate with any students (boys or girls)," defendants made the same assertions to the school board.

Moreover, the accusations were made to the school board in October 1993 by Dr. Harding, a medical professional, who believed that she was under a statutory duty to report sexual predators to an appropriate government agency. Dr. Harding apparently learned of the information that led to her accusation in January 1993, but she never

reported that information to the authorities. In light of plaintiff's daily contact with children after that date, the jury could have found it incongruous that Dr. Harding truly believed that an incident of a sexual nature had occurred.

Finally, defendants' statements and conduct throughout the course of the events give rise to a reasonable inference that defendants did not have reasonable grounds to believe that plaintiff had acted with a sexual purpose. The jury could infer from Dr. Harding's letter to McVein that she would do whatever was necessary to remove plaintiff from the bus route. After all of the investigations and after the school board had heard and apparently decided the matter adversely to their position, the Lundbergs filed a new complaint. Also, Mrs. Lundberg circulated a petition for plaintiff's removal sometime in October. In addition, the October 25, 1993, letter to Launstein from Mr. Harding stated, "we haven't asked that [plaintiff] be disciplined, only reassigned[.]" The jury could have inferred that, if defendants truly believed that plaintiff was a sexual predator, the request that plaintiff be reassigned would have been inappropriate.

There is a delicate balance between protecting parents' rights to act to protect their children from what they consider dangerous or detrimental situations and, at the same time, protecting employees from false, defamatory statements that interfere with their employment relationships. The conditional privilege concept captures that balance. While defendants had a right to protest about what they felt was inappropriate conduct on the part of plaintiff or were unsafe conditions affecting their children and to seek plaintiff's reassignment or termination on those grounds, they did not have the right under the law to procure those results by perpetuating falsehoods or by publishing accusations without believing or having reasonable grounds to believe that they were true. Because there was evidence from which the jury could have inferred that defendants abused any conditional privilege that they held, the trial court properly denied defendants' motion for a directed verdict on the issue and submitted it to the jury.

■■■■■ We now turn to defendants' assignment of error regarding plaintiff's intentional infliction of emotional distress claim. Defendants contend that plaintiff did not prove that they acted with the requisite intent, that their conduct was an extraordinary transgression of the bounds of socially tolerable conduct and that plaintiff's distress was sufficiently severe.[10] To prevail on a claim for intentional infliction of emotional distress, a plaintiff must prove that:

> " '(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct.' " *McGanty*, 321 Or at 543 (quoting *Sheets v. Knight*, 308 Or 220, 236, 779 P2d 1000(1989)).

"[I]ntent exists *'where the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct.'* " *McGanty*, 321 Or at 550 (quoting *Restatement (Second) of Torts* § 46 comment i (1965)) (emphasis in original). Additionally, plaintiff must prove that defendants' conduct constituted an extraordinary transgression of the bounds of socially tolerable conduct. *McGanty*, 321 Or at 543. Initially, "[i]t is a question of law whether, viewing the evidence in the light most favorable to plaintiff, defendants' conduct constitutes 'extraordinary conduct which a reasonable jury could find beyond the farthest reaches of socially tolerable behavior.' " *Tenold v. Weyerhaeuser Co.*, 127 Or App 511, 517, 873 P2d 413 (1994), *rev dismissed* 321 Or 561 (1995) (quoting *Hall v. The May Dept. Stores*, 292 Or 131, 137, 637 P2d 126 (1981)). "Conduct that is merely 'rude, boorish, tyrannical, churlish and mean' does not satisfy that standard," *Watte v. Edgar Maeyens, Jr., M.D., P.C.*, 112 Or App 234, 239, 828 P2d 479, *rev den* 314 Or 176 (1992) (quoting *Patton v. J. C. Penney Co.*, 301 Or 117, 124, 719 P2d 854 (1986)), "nor do 'insults, harsh or intimidating words, or rude behavior ordinarily[.]' " *Id.* (quoting *Hall*, 292 Or at 135). Finally, plaintiff

---

[10] Defendants also assign error to the denial of their motion for a judgment notwithstanding the verdict and a new trial based on the same issue. However, because the "denials of those motions made on the grounds of insufficiency of evidence are not reviewable," *Burke*, 95 Or App at 277, we decline to address them.

must show that he suffered emotional distress as a result of defendant's conduct and that it was severe. *Rockhill v. Pollard*, 259 Or 54, 63-64, 485 P2d 28 (1971).[11]

We have previously concluded that there is evidence from which the jury could have found that defendants accused plaintiff of being a child sex abuser without believing or having reasonable grounds to believe that accusation to be true. From the evidence, the jury could also have inferred that defendants knew that the making of those statements was substantially certain to cause emotional distress. Additionally, such a defamatory accusation would have a particularly damaging effect on a school employee whose job involves continual contact with children. A reasonable jury could have also inferred from the evidence that, even though the multiple investigations concluded that no inappropriate conduct had occurred, defendants persisted. In that light, defendants' conduct was more than merely insulting, harsh, churlish, intimidating, mean or tyrannical. In order intentionally to interfere with plaintiff's livelihood as a bus driver for the district and to remove him from their children's bus route, defendants continued to accuse him of being a sex abuser. Such accusations could result in permanent, public stigmatization as a sex offender because society considers child sex abuse to be highly reprehensible conduct.[12] Thus, we conclude that defendants' defamatory conduct is so extraordinary that *a reasonable jury* could have found it to be beyond all bounds of socially tolerable conduct.

Furthermore, plaintiff testified that he felt depressed and consulted his physician as a result of the investigations spawned by defendants' accusation. Plaintiff's physician diagnosed him with an acute adjustment reaction with features of anxiety and depression and placed him on an antidepressant. The physician attributed the adjustment disorder to plaintiff's work-related difficulties and pressures,

---

[11] In *Rockhill*, the court concluded that the plaintiff's "[m]ental distress would have to be more than mild and transitory in order to cause [the plaintiff's] symptoms over a two-year period." 259 Or at 64. Thus, the intensity and the duration of the distress are important inquiries when examining severity.

[12] For example, those convicted of sexual offenses involving children are subject to severe criminal penalties and to registration as a sex offender. ORS 181.594 *et seq.*

including the complaints from defendants. His psychiatrist indicated that the stress at work was the major contributing cause of plaintiff's disorder. Plaintiff was not declared medically stationary until August 1994. Based on its duration and intensity, the jury could have inferred that plaintiff's distress was severe. Consequently, the trial court did not err in denying defendants' directed verdict motion on plaintiff's claim for intentional infliction of emotional distress.

■ Even though the trial court erred in denying defendants' motion for a directed verdict on the defamation claim, we need not remand for a new trial because the error could not have affected the amount of damages that the jury awarded to plaintiff on the other claims. Separate questions on the verdict form for each defendant required the jury to indicate each defendant's liability for defamation, intentional interference with economic relations and intentional infliction of emotional distress claims. Each form went on to state that if defendant was liable based on any theory, the jury was to proceed to the fourth question which provided:

"(4) What are the Plaintiff's damages?

"ANSWER: Economic Damages $ 5387[.]27
Noneconomic Damages $ 127,500
Punitive Damages $ 75,000."

The jury was instructed to determine the unsegregated amounts that represented plaintiff's economic, noneconomic and punitive damages that resulted from defendants' conduct rather than to calculate damages for each claim. In particular, the jury was instructed:

"If you find that the Plaintiff is entitled to recover against more than one Defendant on any one cause of action or for all causes of action, you must return a verdict in a single sum against the Defendant whom you find liable."

With regard to the verdict forms, the court instructed the jury:

"When you answer [the question regarding damages], you should not attempt to attribute a particular percentage of the damages to a particular Defendant. The nine jurors who agree should simply state the Plaintiff's damages in each

category on economic, non-economic, and punitive damages. If the nine jurors who agree decide that one or more Defendants are at fault then the Court will calculate the liability when entering judgment. If the nine jurors who agree decide that Plaintiff has incurred damages and that one or more Defendant is liable for the damages, then the answer should be identical on each verdict form."

Thus, even though the trial court erred in denying the motion for a directed verdict on the defamation claim, the unsegregated amount of damages based on defendants' conduct is the same for the other claims.

 Next, we turn to defendants' fourth assignment of error, in which they contend:

"The trial court erred in submitting plaintiff's claim for punitive damages to the jury and in subsequently denying defendants' motion for judgment notwithstanding the verdict or for a new trial. The trial court further erred in instructing the jury on punitive damages. * * *

"Assuming without conceding, that the jury was entitled to consider plaintiff's claim for punitive damages, the trial court erred in failing to issue a limiting instruction to the jury that punitive damages could only be awarded for conduct which was not speech."

Defendants raised the issue of the propriety of the punitive damage award for the first time in their motions for judgment notwithstanding the verdict and a new trial. Under *Gardner v. First Escrow Corp.*, 72 Or App 715, 727-28, 696 P2d 1172, *rev den* 299 Or 314 (1985), the grounds asserted in a motion for judgment notwithstanding the verdict must be raised in a motion for directed verdict and in a manner that specifically calls the trial court's attention to the issue. Defendants did not raise the issues in the fourth assignment of error to the trial court in their motion for a directed verdict, and, therefore, they are not preserved for purposes of appeal. Also, during oral argument, defendants' counsel indicated that "[t]here's no issue on the limiting instruction because there was not a request made to give a limiting instruction." Thus, that issue also is not preserved. ORAP 5.45(2).

 Finally, we turn to defendant's fifth assignment of error, in which they contend that "[t]he trial court erred in

failing to reduce the jury's award of punitive damages" because: (1) the award was based on claims for which punitive damages are not authorized; (2) the defendants' communications were important and made in good faith; and (3) there is no evidence of willful or malicious intent.[13] We understand defendants' argument to contend that the jury's award is constitutionally excessive. This issue was raised procedurally in the same manner as the issue in the fourth assignment of error. However, the issue of an excessive award is properly raised for the first time after the jury returns its verdict, unlike issues involving the propriety of submitting a claim for punitive damages to a jury. Thus, the post-trial motion challenging the excessiveness of the punitive damage award in this case is properly before us.

■■■■ To determine whether punitive damage awards are excessive and in violation of the Due Process Clause of the federal constitution, the court in *Oberg v. Honda Motor Co.*, 320 Or 544, 551, 888 P2d 8 (1995), *cert den* 517 US 1219 (1996), stated that

> "the legal standard to apply to post-verdict judicial review of a jury's award of punitive damages is as follows: Was the award of punitive damages within the range that a rational juror would be entitled to award in the light of the record as a whole? The range that a rational juror is entitled to award depends, in turn, on the statutory and common law factors that the jury is instructed and permitted to consider when awarding punitive damages for a given claim."

After this standard was announced, the United States Supreme Court in *BMW of North America, Inc. v. Gore*, 517 US 559, 116 S Ct 1589, 134 L Ed 2d 809 (1996), articulated three guideposts to identify constitutionally excessive awards. We described the *BMW* analysis in *Parrott v. Carr Chevrolet, Inc.*, 156 Or App 257, 275, 965 P2d 440 (1998):

> "Under *BMW*, the starting point for examination of a punitive damage award is identification of the state's interests that a punitive award is designed to serve. Underlying the inquiry are elementary notions of fairness: that persons must receive fair notice of the conduct that will subject

---

[13] Because plaintiff commenced his action before September 9, 1995, ORS 18.537 does not apply. Or Laws 1995, ch 688, § 5.

them to punishment and also of the severity of the penalty the state may impose. The United States Supreme Court articulated three 'guideposts' to assist in evaluating whether the award exceeds constitutional limits: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the harm or potential harm suffered and the punitive damage award; and (3) the difference between the award and the civil or criminal penalties authorized or imposed in comparable cases. Although those guideposts are not exclusive, other considerations must be grounded in clear legal principles or historical or community-based standards. (Citations omitted.)"

At the outset, we note that we are mindful that the state's interest in allowing punitive damages is to punish willful, wanton or malicious wrongdoers and to deter similar conduct by the wrongdoers and others who are situated similarly. *Friendship Auto v. Bank of Willamette Valley*, 300 Or 522, 532, 716 P2d 715 (1986). First, we examine the extent of reprehensibility of defendants' conduct, which may be the most important factor. *BMW*, 517 US at 575. This examination focuses our attention on whether the award reflects the enormity of defendants' conduct. *Id.* As the court indicated in *BMW*, "[t]hree aggravating factors associated with particularly reprehensible conduct are (1) whether defendant's conduct was violent or threatened violence; (2) whether defendant acted with trickery or deceit as opposed to mere negligence; and (3) whether defendant has engaged in repeated instances of misconduct." *Parrott*, 156 Or App at 276. Here, the jury could have found that defendants accused plaintiff of being a child sex abuser, without believing or having reasonable grounds to believe that it was true and intending that it interfere with his economic relationship with the district. Defendants' complaints persisted even though a series of investigations concluded that inappropriate conduct had not occurred. Thus, defendants' conduct was reprehensible in the sense contemplated by *BMW*.

Second, we examine the disparity between the harm suffered or the potential harm and the punitive damage award. In this case, the ratio between the punitive damage award and the sum of the economic and noneconomic damages is approximately .6 to 1. Thus, the disparity is quite

small and weighs in favor of upholding the punitive damage award.

Although the parties do not cite to any criminal statutes governing comparable conduct, the Court in *BMW* also examined under this guidepost whether a lesser penalty would have the effect of deterring future misconduct. 517 US at 584. In *Blume v. Fred Meyer, Inc.*, 155 Or App 102, 104-05, 963 P2d 700 (1998), the plaintiff had been stopped in the defendant's store and her bag had been searched pursuant to the defendant's policy to randomly check customers for receipts. We upheld a punitive damage award of $450,000 when compensatory damages awarded were only $25,000. *Id.* While we noted in that case that the random application of defendant's policy could have resulted in innocent people being accused of theft, we also indicated that defendant's egregious conduct caused an injury that went beyond mere economic harm and instead interfered with plaintiff's right of personal freedom. *Id.* at 114, 119. Here, as in *Blume*, defendants' conduct caused more than mere economic loss. Plaintiff has suffered injury to his health as well as the potential of societal stigmatization. Based on the facts of this case, we cannot say that a lesser penalty would deter future misconduct. Thus, after our independent examination of the jury's award in light of the *BMW* guideposts, we conclude that the jury's award did not cross the line between permissible and excessive awards. The trial court correctly refused to reduce the punitive damage award.

Affirmed.