Argued and submitted August 3, 2007, affirmed March 5, 2008

James HOUSE,
*Plaintiff-Appellant,*

*v.*

Thomas B. HICKS;
Marisa Hastie,
aka Marisa Barsness;
and University of Oregon,
*Defendants-Respondents.*

Lane County Circuit Court
160511743; A130796

179 P3d 730

David C. Force argued the cause and filed the briefs for appellant.

Denise G. Fjordbeck, Senior Assistant Attorney General, argued the cause for respondents. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim and Sercombe, Judges.

SERCOMBE, J.

Edmonds, P. J., concurring.

## SERCOMBE, J.

Plaintiff assigns as error the trial court's grant of summary judgment to defendants on plaintiff's claims for defamation, intentional infliction of severe emotional distress (IIED), and deprivation of liberty based on 42 USC section 1983. We affirm the trial court's grant of summary judgment on the IIED claim. We reject without discussion plaintiff's remaining claims of error regarding the court's rulings on the untimeliness of the defamation claim and the sufficiency of the civil rights claim.

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. ORCP 47 C. We review the evidence and any inferences that may reasonably be drawn from that evidence in the light most favorable to the party opposing the motion. *McGee v. Coe Manufacturing Co.*, 203 Or App 10, 12, 125 P3d 26 (2005).

Plaintiff filed his IIED claim after he was excluded from the University of Oregon campus for engaging in unwanted contact with a university employee. Plaintiff seeks relief against the University of Oregon, its employee (Hastie), and the university's director of the Department of Public Safety (Hicks). Plaintiff asserts that defendants knowingly initiated a false police report and knowingly excluded him from campus, actions that caused him to suffer humiliation, embarrassment, anger, and severe emotional distress, conduct that he argues exceeds the bounds of social tolerance.

Plaintiff met Hastie in the spring of 2003. He alleges that Hastie solicited his friendship through a personal advertisement of "women seeking men" on an Internet Web site. At that time, Hastie was a married graduate student at the university. Plaintiff and Hastie met for drinks and lunches three times during June and July 2003. They corresponded by e-mail through the summer. Hastie stopped corresponding with plaintiff in September. Plaintiff continued to send Hastie e-mails and placed a number of telephone calls to her home.

On December 1, 2003, Hastie sent plaintiff an e-mail indicating that she wanted to end communications with him, stating:

"I have to tell you that you did scare me quite a bit * * *. I felt a huge amount of pressure from you. I also felt that you were trying to make me feel guilty for not calling or writing long e-mails back. * * * There was a definite turning point in our friendship where I started to feel very uncomfortable. I don't think that I feel comfortable enough to meet with you. Sorry. Some of the things you have said have really freaked me out. * * * I don't feel that it is wise for me to continue contact with you. I am confused by the different temperaments you have. I don't know you and what I do know kind of scares me. * * * I don't feel that you are willing to relax and give me the freedom and space that I need, so I need to take a huge step back and out of this friendship."

Hastie included in that e-mail an invitation to "write back if you have any questions." Plaintiff subsequently sent Hastie gifts and several e-mails, but Hastie did not respond.

The following month, plaintiff joined the university alumni association; he is not an alumnus but found out that membership is open to the public for a small donation. He knew that such a membership would enable him to take fitness classes at the student recreation center, and he knew that Hastie taught classes there.[1] On January 28, 2004, plaintiff attended an exercise class that Hastie was teaching. Plaintiff stayed in the room for 10 minutes after that class and waited in the hallway when Hastie left the room. Although plaintiff sensed that Hastie "seemed comfortable" during the class, Hastie later told the university's Department of Public Safety (DPS) that she was uncomfortable with plaintiff's presence and asked a colleague to walk her to her car.

Over the next two days, plaintiff sent Hastie three lengthy e-mails and three e-cards. He also re-sent one or two

---

[1] Plaintiff sent Hastie an e-mail on January 26 reciting a poem he wrote about "the misunderstandings that had arisen between us in the summer" and noting that "if you decide to stay with your decision to not be friends do just tell me and I will never write or bother you again." Plaintiff also informed Hastie that he planned to join the student recreation center and "the odds might be pretty high we may run across each other, especially if you are teaching that class I want to take."

of the e-mails. The first e-mail was sent around midnight, a few hours after the exercise class. Plaintiff asked Hastie why she had someone walk her to her car and indicated his intention to continue with the class "every time for the remaining 6 weeks." He also stated that he assumed that Hastie was choosing not to be friends, that he was sorry if he made her uncomfortable after class by "waiting," that he was not there to watch her or follow her to her car or "whatever else you think that makes you so scared." He asserted that Hastie did not care to listen to reason, that maybe after a few weeks of class she might choose to talk to him, that she should not be scared of him and treat him like "some kind of stalker," and that she could have told him that she did not want to be his friend. Plaintiff further stated, "[P]lease don't ruin my reputation by telling others that I am stalking you [be]cause you are making a huge mistake; please don't make a mess also." In that same e-mail, plaintiff called Hastie "childish," a "flake," and "paranoid," and stated that he would show up early for each class in case she decided to talk to him. He said that it was the last time he would write. Plaintiff later attached that e-mail message to an electronic e-card greeting to Hastie, noting that, "I also attached this message in case you blocked my e-mail address."[2] Later that morning, plaintiff separately sent that e-mail message to Hastie at a different e-mail address.

Early the next morning, plaintiff sent Hastie a second lengthy e-mail, claiming that he was writing because he had some things to get off his chest and she didn't "seem to be willing to talk like adults." He indicated that he wanted Hastie to be friendly with him in the exercise class. Plaintiff further stated that "[y]ou really have not been that great a person towards me ever since you started to make yourself uncomfortable by worrying that you have to protect yourself" and that Hastie could have been more direct with him over the past few months. He admitted calling and listening to her

---

[2] In a separate e-card sent to Hastie, plaintiff said that "[y]ou really have not been really fair to me but I guess I just have come off really bad. It is my mistake to live with. I hope we can remain friendly and professional. Maybe you might gain over time enough comfort to talk to me personally * * *." Plaintiff then stated, "You really won't hear from me anymore and * * * I will respect what you want, your space, your comfort. And I will say again, I'll always be here as a friend, Always!"

answering machine multiple times over the past summer, stating that it was an innocent action, "not obsessive or threatening." He also admitted knowing that she was online at times, but denied monitoring her e-mail activity. Plaintiff wrote that Hastie could have been more understanding and respectful, like a "responsible adult." He added that, if she chose to be friends, he would be "ready to be a friend no matter where in life down the road we are" and that he hoped that after some time in the class she would be able to talk to him. Plaintiff ended the e-mail with a request that Hastie not make him "regret" that he ever met her by "treating [him] like some criminal, spreading [her] paranoia to others and making [him] look bad[.]" He then stated that he would like to know how she liked the necklace and other items that he had sent her.

Hastie sent a response that plaintiff received that afternoon, denying that her behavior was childish or immature, noting that the amount of information plaintiff was gathering about her and her life was making her uncomfortable, and asserting that she had attempted to cut off all contact with him yet he had persisted in finding out her maiden name, work address, and teaching schedule. She stated:

> "You have frightened me beyond belief and last night was a culmination of all the contact you have continued to pursue. I did feel the need to have an employee of mine walk with me and before I even asked him, he thought it was odd that you kept hanging around outside of my class. Furthermore, I want to know how you [k]new that he walked me to my car when I didn't even leave the building for another 20 minutes. This is exactly what I am talking about."

Hastie reiterated her wish to cut off all contact with plaintiff, stating that she would not deny anyone access to her class, but that he should respect her personal fears and cease contacting her. She ended by stating that she would file a report with the police if the communication continued and that she had already contacted her lawyer.

Later that evening, plaintiff sent another e-mail, admitting that he had looked up her maiden name and work e-mail address, but contending that her reasons for cutting off contact in December were "misguided and mistaken," and

that he would have given her space if she had given him the "chance." Plaintiff disputed Hastie's fear that he would "do something bad" to her and stated that things would not have gotten so "crazy" if she were not paranoid and presumptuous. Plaintiff questioned Hastie's choice not to respond to his e-mails thus far and asked her again to "reconfirm" that she wanted to cut off contact with him. He called her conversation with a lawyer "extremely childish" and went on to say that a few "older" people agreed that Hastie was a "flake," but, if she wanted to try and be friends, "the bridge is always there." Plaintiff implored her not to call the police, calling that prospect "ridiculous." He ended with a similar plea to understand that he was simply trying to communicate, a statement that he would be taking her class for the rest of the term, and again called her behavior judgmental and paranoid.

Plaintiff sent Hastie another e-card around that time, noting that he was a "very persistent person" and that "it is unfortunate that my persistence scares you." He complained that Hastie "really need[ed] to work on communication" because she had "come off a bit stuck up." Plaintiff wrote that Hastie was "by far the most naive, paranoid, and presumptuous person I have ever met." He charged that she seemed "to have poor judgment brewing strong." Plaintiff continued:

> "You wrote me once in the last 4 months, and half the stuff you said about me were false assumptions, again I simply asked to confirm that was your final decision and you blew me off (does that seem responsible and mature). You never even tried talking to me (even if you really wanted to not be friends I would have understood, see I am adult about things and very understanding.) Yea[h] me worrying under stress after you avoiding me for months was not very mature but I admitted my mistake and that I was wrong (can you admit you could have handled this much better?)."

Plaintiff stated that "there is nothing grown up about your behavior" and that Hastie had "overreacted beyond overreaction" but "I will always be here if you would by some far chance want to admit you hastily jumped to conclusions and misjudged me." He ended the e-card by declaring that "I really mean this is the last [communication]" but "if you

really want to be nice you would tell what you thought (your opinion) about those CD's I gave you, pretty please."

Concerned for her safety, Hastie contacted DPS on January 30, 2004. According to the DPS report of Hastie's complaint, she stated that she was "being stalked" by plaintiff and "denied having any history of cohabitation, romantic and/or familial relationship" with plaintiff. Hastie provided DPS a copy of her January 29 e-mail to plaintiff and the e-mail and e-card correspondence received from him "that prompted the filing of this complaint." DPS requested assistance from the Eugene Police Department. The DPS report recounts the statements made by Hastie to DPS and a Eugene police officer that, according to plaintiff, are the foundation of plaintiff's IIED claim against Hastie:

> "Upon [the Eugene police officer's] arrival, HASTIE stated that she first became acquainted with HOUSE during the summer of 2003 in her capacity as a Graduate Teaching Fellow assigned to conduct classes at the Student Recreation Center and that their relationship had been strictly limited to that of an instructor and pupil. Subsequently, she began receiving e-mails, phone calls and packages from HOUSE at her place of business. Despite her repeated request that he not do so, HOUSE has continued such unwanted contact via e-mail correspondence, phone calls to HASTIE's residence and place of business. Further, HASTIE stated that she believes that HOUSE enrolled in a Monday night exercise class taught by her at the Student Recreation Center with the express intention of continuing unwanted contact with her. HASTIE stated that HOUSE has been observed loitering in and around the facility watching her and believes that he has attempted to follow her to her vehicle."

Hastie declined to initiate a procedure for obtaining a stalking protective order under ORS 163.744, stating that she "did not wish to participate in a criminal proceeding against [plaintiff]." A supplemental DPS report quotes Hastie to say

> "she did not desire [that plaintiff] be prosecuted for the harassing and stalking behavior, but only wished that it would stop. She requested that [the Eugene police] contact [plaintiff] and advise him of the laws concerning repeated, unwanted contact, and to tell him officially that no more contact is allowed."

After reviewing plaintiff's communications and talking to Hastie, DPS issued a trespass notice excluding plaintiff from campus for 18 months. A Eugene police officer advised plaintiff not to contact Hastie in any manner, that the university had withdrawn his recreation center privileges, and that he was excluded from university property. Plaintiff was subsequently sent a written notice of the order and a letter offering him a refund of his alumni association membership fee. Hastie also sent plaintiff a letter at the request of university counsel, advising plaintiff that she did not wish for him to attempt to contact her in any way.

In June 2005, plaintiff filed a complaint against the university, Hicks, and Hastie that included three claims. Plaintiff's first claim was that the university and Hastie had made false and defamatory statements that portrayed him as being guilty of stalking and telephonic harassment. Specifically, plaintiff alleged that Hastie had falsely stated that she became acquainted with him at the recreation center in her capacity as instructor, that their sole relationship was instructor-pupil, that he had sent her unwanted e-mails and phone calls and sent packages to her university address, that her only response was to tell him repeatedly not to contact her in any way, that he continued to e-mail and call after she had asked him not to, and that he had loitered after the exercise class and attempted to follow her to her car. Plaintiff's second claim was for IIED for knowingly initiating a false police report that included the above information, for sending him a letter stating that he had been stalking an employee, for excluding him from campus for 18 months, and for refusing his request to visit campus for one day to post signs. Plaintiff's third claim alleged that Hicks deprived him of a liberty interest by excluding him from campus; plaintiff argued that only the governor can issue such a "proclamation."

Defendants moved for summary judgment, contending that the defamation claim was barred by the one-year statute of limitations, that the facts alleged did not support a claim for IIED, and that plaintiff had no liberty interest in frequenting the university campus. Defendants' argument in support of their motion for summary judgment on the IIED

claim was based in large part on the e-mail and e-card correspondence sent by plaintiff to Hastie, depositions, and other sworn testimony.[3] Plaintiff asserted in his affidavit in opposition to the motion that Hastie made false statements to the police about their friendship: that their relationship started as an instructor-pupil relationship rather than as a result of an Internet solicitation; that there were unwanted contacts after repeated demands to end communications rather than correspondence following a single request to stop; that the contacts were at her place of business as opposed to her home; and that plaintiff followed Hastie to her car after the recreation class. Plaintiff contended that those false statements were set out in the DPS reports and that the utterance of those statements caused him emotional distress. The trial court granted the summary judgment motion, concluding that the allegations of the IIED claim "do not, as a matter of law, meet the level of conduct or injury that is needed to support the IIED theory of recovery." We affirm the allowance of summary judgment on the IIED claim because, in the context of this case, no reasonable juror could conclude that the identified conduct of defendants was extremely outrageous.

■■  An IIED claim requires plaintiff to prove three elements: (1) that defendants intended to cause plaintiff severe emotional distress or knew with substantial certainty that their conduct would cause such distress; (2) that defendants engaged in outrageous conduct, *i.e.*, conduct extraordinarily beyond the bounds of socially tolerable behavior; and (3) that defendants' conduct in fact caused plaintiff severe emotional

---

[3] Plaintiff's concealed handgun permit was revoked because of the trespass order. Plaintiff challenged the revocation in Lane County Circuit Court. The hearing transcript of that proceeding was part of the summary judgment record. In his testimony at that hearing, plaintiff acknowledged that he had not received an e-mail from Hastie from September 2003 until December 2003 when Hastie sent the e-mail cutting off contact and stating that she was afraid of him. Plaintiff testified that the reasons Hastie said "why I scared her were not very sensible." Hastie testified at the concealed handgun license hearing and reiterated the contents of the e-mails and repeated calls to her answering machine. She stated that she felt sick, scared, and nervous at the class he attended and that she had been "really afraid" when she contacted campus police. She testified that each time she asked him to leave her alone, plaintiff became more agitated and continued to contact her. After hearing testimony from both Hastie and plaintiff, the court determined that Hastie had reason to be alarmed and sustained the concealed handgun permit revocation.

distress. *McGanty v. Staudenraus*, 321 Or 532, 543, 550, 901 P2d 841 (1995). Because proof of intent is often indirect and evidence of psychic harm is usually self-serving, proof of this tort largely turns on the second element, whether a defendant's conduct is sufficiently outrageous.

■  A trial court plays a gatekeeper role in evaluating the viability of an IIED claim by assessing the allegedly tortious conduct to determine whether it goes beyond the farthest reaches of socially tolerable behavior and creates a jury question on liability. *Tenold v. Weyerhaeuser Co.*, 127 Or App 511, 517, 873 P2d 413 (1994), *rev dismissed*, 321 Or 561 (1995); *see also Pakos v. Clark*, 253 Or 113, 132, 453 P2d 682 (1969) ("It was for the trial court to determine, in the first instance, whether the defendants' conduct may be reasonably regarded as so extreme and outrageous as to permit recovery."). The *Restatement (Second) of Torts* § 46 comment h (1965) describes the judge and jury roles in evaluating an IIED claim as follows:

> "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable [persons] may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability."

The classification of conduct as "extreme and outrageous" depends on both the character and degree of the conduct. As explained in the *Restatement* at § 46 comment d:

> "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

■  Whether conduct is an extraordinary transgression is a fact-specific inquiry, to be considered on a case-by-case basis, based on the totality of the circumstances. We consider whether the offensiveness of the conduct "exceeds any reasonable limit of social toleration[,]" which is "a judgment

of social standards rather than of specific occurrences." *Hall v. The May Dept. Stores*, 292 Or 131, 137, 637 P2d 126 (1981).

■        Any "judgment of social standards" requires, in the first instance, an evaluation of whether the conduct in question is favored or made privileged by law, or disfavored or made unlawful by the legislature. The *Restatement* at § 46 comment g speaks of "privileged" conduct:

> "The conduct, although it would otherwise be extreme and outrageous, may be privileged under the circumstances. The actor is never liable, for example, where he has done no more than insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress. Apart from this, there may perhaps be situations in which the actor is privileged to resort to extreme and outrageous words, or even acts, in self-defense against the other, or under circumstances of extreme provocation which minimize or remove the element of outrage."

■        In the same vein, the illegality of conduct is relevant to, but not determinative of, whether the conduct is sufficiently outrageous to support an IIED claim. In *Shay v. Paulson*, 131 Or App 270, 884 P2d 870 (1994), we upheld dismissal of an IIED claim based on harassment through forged magazine subscriptions. Although the defendant's alleged forgery was a crime (first-degree forgery under ORS 165.013), we determined that it was not "the type of conduct that constitutes an extraordinary transgression of the bounds of socially tolerable behavior." 131 Or App at 274. We reasoned:

> "If the cited decisions illustrate one consistent point, it is that the inquiry of whether conduct is an extraordinary transgression of the bounds of socially tolerable behavior is fact-specific. * * * It would be inconsistent with that requisite to hold that, because conduct is illegal, or even criminal, it is *per se* 'outrageous in the extreme.' *See Restatement (Second) of Torts* § 46 *comment* d (1965). The legislature's decision to treat certain conduct as unlawful, or even as criminal, reflects its judgment that the conduct is a transgression of society's general expectations; however, for that same conduct to be considered tortious as an 'extraordinary transgression,' it must be evaluated under the standard set forth in the cited cases."

*Id.* at 273-74. Thus, the character and context of particular conduct frames its categorization as outrageous or not.

■ Our precedents identify several contextual factors that guide the court's classification of conduct as extreme and outrageous. The most important factor is whether a special relationship exists between a plaintiff and a defendant, such as an employer-employee, physician-patient, counselor-client, landlord-tenant, debtor-creditor or government officer-citizen, that shapes the interpersonal dynamics of the parties. A defendant's relationship to the plaintiff may be one that "imposes on the defendant a greater obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in arm's-length encounters among strangers." *McGanty,* 321 Or at 547-48; *see Hall,* 292 Or at 137; *Woods v. First American Title Ins. Co.,* 102 Or App 343, 794 P2d 454, *adh'd to on recons,* 104 Or App 100, 798 P2d 1121 (1990), *rev den,* 311 Or 151 (1991) (employer-employee); *Turman v. Central Billing Bureau,* 279 Or 443, 568 P2d 1382 (1977) (debtor-creditor); *Rockhill v. Pollard,* 259 Or 54, 485 P2d 28 (1971) (physician-patient); *Checkley v. Boyd,* 170 Or App 721, 14 P3d 81 (2000), *rev den,* 332 Or 239 (2001) (church-congregation member); *Williams v. Tri-Met,* 153 Or App 686, 958 P2d 202, *rev den,* 327 Or 431 (1998) (government employee-disabled citizen); *Fitzpatrick v. Robbins,* 51 Or App 597, 626 P2d 910, *rev den,* 291 Or 151 (1981) (landlord-tenant). Indeed, a " 'special relationship' between the parties has played a role in every case in this state involving [a successful claim of IIED]," *Christofferson v. Church of Scientology,* 57 Or App 203, 209, 644 P2d 577, *rev den,* 293 Or 456 (1982), *cert den,* 459 US 1206 (1983), a factor that has remained "generally true" in more recent cases. *Delaney v. Clifton,* 180 Or App 119, 131, 41 P3d 1099, *rev den,* 334 Or 631 (2002).

■ Other factors include whether the conduct was undertaken with an ulterior motive or to take advantage of an unusually vulnerable individual. *Checkley,* 170 Or App at 727 n 4. The setting in which the conduct occurs, for example, whether it occurred in a public venue or in an employment context, also bears on the degree of its offensiveness. *Hall,* 292 Or at 137.

■　　On appeal, plaintiff contends that defendants' outrageous conduct was the initiation of a false police report, a crime under ORS 162.375,[4] and his exclusion from the university campus, an exclusion allegedly inconsistent with ORS 276.095 and ORS 131.705 to 131.735. Plaintiff argues that the initiation of a false police report is conduct analogous to the character of behaviors that this court has found to be outrageous in past cases.

We first examine whether the conduct in question is favored or disfavored by legislative classification. The allegedly false statements by Hastie to DPS are collateral to an otherwise legitimate complaint of unwanted contacts, including a contact in the student recreation center, Hastie's place of employment. Plaintiff does not dispute that he continued to communicate with Hastie, sent her a gift, and appeared in her class after she stated a desire to end all communications with him, other than clarifying questions, on December 1. Plaintiff continued to communicate with Hastie after the January 29 demand to cease any contact, conduct that, according to DPS, "prompted the filing of [Hastie's] complaint." Plaintiff's communications after the January 28 recreation class were increasingly hostile. Plaintiff threatened to continue to contact Hastie at upcoming recreation classes.

ORS 654.062(1) encourages employees to report workplace safety concerns to their superiors. The statute provides:

> "Every employee should notify the employer of any violation of law, regulation or standard pertaining to safety and health in the place of employment when the violation comes to the knowledge of the employee."

We do not decide whether that statute applies here, whether criminal stalking conduct occurred under ORS 163.732, or whether ORS 163.732 is a "law * * * pertaining to safety * * * in the place of employment." Suffice it to say, ORS 654.062(1) reflects a social standard that encourages the

---

[4] ORS 162.375(1) provides:

"A person commits the crime of initiating a false report if the person knowingly initiates a false alarm or report which is transmitted to a fire department, law enforcement agency or other organization that deals with emergencies involving danger to life or property."

reporting of workplace safety concerns by Hastie to her university employer.

More broadly, the statutory process for obtaining a stalking protective order also promotes the reporting of repeated, unwanted, and alarming contacts to police authorities. ORS 163.744 allows the initiation of proceedings for a citation and stalking protective order by "presenting a complaint to a law enforcement officer or to any law enforcement agency." The statute creates a legal right to voice a complaint about conduct that may constitute stalking. ORS 163.738(2)(a)(B) defines the conduct that can provoke a stalking protective order as intentional, knowing, or reckless repeated and unwanted contacts that creates alarm or coercion that is objectively reasonable and that causes reasonable apprehension about the victim's personal safety. "Contacts," as defined by ORS 163.730(3), include sending electronic communications, waiting outside a place of work, and coming into the physical presence of another. Plaintiff made those types of contacts with Hastie and admitted in his correspondence that they were unwanted. Hastie made no complaint under ORS 163.744, and the statute creates no privilege in this case. However, the social judgment behind ORS 163.744—that encourages the reporting of certain types of repeated and unwanted contacts—discounts any classification of Hastie's truthful reporting of repeated and unwanted contacts as outrageous.

To be sure, ORS 162.375 makes it a crime to knowingly initiate a false report to a law enforcement agency. According to plaintiff, Hastie lied about the origin of their relationship, the extent of his unwanted e-mails and telephone calls, her attempts to end the relationship, and whether plaintiff followed Hastie to her car on January 28. Viewed in the light most favorable to plaintiff, the record suggests that Hastie made false reports about the origin of the relationship and her repeated attempts to end the relationship and that unwanted gifts, e-mails, and telephone calls were being made to her place of business. As we held in *Shay*, however, the commission of a crime is not necessarily outrageous conduct for purposes of determining liability for IIED. Our cases hinge IIED liability based on initiating false police

reports on the nature of the false statement, the legal relationship between the parties, whether a defendant made the false statement with an ulterior motive, and whether the conduct was directed to a person who is particularly vulnerable to emotional distress.

Furthermore, the case law suggests that the character of the false statements must defame or significantly stigmatize the IIED plaintiff, that is, they must describe that person and be injurious to his or her reputation. Accordingly, in *Checkley*, 170 Or App at 727, we concluded that "a defendant's publication of a defamatory or otherwise significantly stigmatizing statement, knowing the statement to be false, unfounded, or unsubstantiated, is conduct that, if found to be true by a factfinder, constitutes an extraordinary transgression of what is socially tolerable." In *Checkley*, the stigmatizing accusations were that the plaintiff had abused, neglected, and stolen funds from his brother, a person with mental disabilities for whom the plaintiff was guardian. Similarly, in *Kraemer v. Harding*, 159 Or App 90, 976 P2d 1160, *rev den*, 329 Or 357 (1999), the plaintiff was alleged to be a child molester.

In *Woods*, we held that the plaintiff's complaint stated facts sufficient to constitute an IIED claim. The complaint alleged that the defendants, the plaintiff's employer and its agent, changed the office locks, refused to give the plaintiff a key, accused her of theft, fired her, called the police department, and had an officer go to her home knowing that the theft complaint was false. Those actions were taken to get retribution, while knowing that the plaintiff was ill. We stated that those facts, if true, exceeded the bounds of socially tolerable conduct because "[f]alsely accusing someone of being a liar, a thief and a fraud before a third person, knowing that the accusations are not true, and persuading a police officer to harass the accused person on the basis of those assertions, constitute more than every-day rude behavior." 102 Or App at 348.

In *Hall*, the Supreme Court focused on the character of the conduct alleged to be outrageous, stating that actions designed to threaten a plaintiff without regard for her guilt

or innocence could be seen by a jury as outrageous. Specifically, the defendant employer told the plaintiff employee that he would obtain a warrant for her arrest and accused her of stealing money, even though he knew that there was no convincing evidence of any unlawful conduct. 292 Or at 132-33.

In contrast, much of Hastie's allegedly false reporting was not sufficiently stigmatizing so as to qualify as outrageous conduct. Hastie's allegedly false statements about the start of the relationship and the frequency of unwanted contacts do not describe plaintiff's character or motive, or particularize the substance of plaintiff's communications with her; they set out the context of plaintiff's behavior. Hastie's dissembling in those regards is not so outrageous in character or extreme in degree to rise to the quality of "an extraordinary transgression of what is socially tolerable."

Plaintiff further asserted that Hastie falsely represented to the police authorities that he "had been loitering in and around the Student Recreation Center watching her, and had attempted to follow her to her vehicle" and that she was "being stalked."[5] Those accusations, even if false and stigmatizing, are not extreme and outrageous in nature when viewed in context. First, there is no relationship between plaintiff and Hastie that imposes on Hastie a greater obligation to refrain from subjecting plaintiff to emotional distress. As we noted earlier, courts are more likely to categorize conduct as outrageous when it is undertaken by the dominant party in a legal relationship. Plaintiff had no legal relationship to Hastie, and there is no contention that Hastie's conduct was more oppressive because it exploited a relationship of power. Indeed, it is the absence of any relationship that provoked plaintiff's badgering in January 2004. The absence of any special relationship between the parties was significant in finding no outrageous conduct in *Shay* and in *Rosenthal v. Erven*, 172 Or App 20, 17 P3d 558 (2001) (action by husband against wife's paramour).

---

[5] Hastie's actual report was that "she believes" both that plaintiff enrolled in the class with the intent to continue unwanted contacts and that plaintiff attempted to follow her to her vehicle. Those beliefs were corroborated by her January 29 e-mail to plaintiff. Plaintiff produced no evidence that Hastie held contrary beliefs.

Second, plaintiff was not particularly vulnerable to any intentional conduct to cause extreme emotional distress. He was not physically disabled as was the blind plaintiff in *Turman* or physically ill as was the complainant in *Woods*.

Third, Hastie did not act with an ulterior motive, a motive to advance an illegitimate purpose.[6] She eschewed the initiation of a procedure for a citation and stalking protective order under ORS 163.744 and discouraged any criminal prosecution of plaintiff. Her expressed motive was to protect herself, to obtain an official warning to plaintiff that "no more contact is allowed." That motive was not ulterior. *Cf. Dalby v. Sisters of Providence*, 125 Or App 149, 865 P2d 391 (1993) (IIED claim alleged by false accusation of theft where the defendant encouraged police investigation and arrest for theft charge in retaliation for the plaintiff's complaint that the defendant failed to comply with drug inventory rules); *Woods*, 102 Or App at 348 (false accusation of being a liar, thief, and fraud to instigate police investigation and in retaliation for business practice).

Finally, the setting of Hastie's conduct is relevant. Hastie's statements were made in private to DPS and a Eugene police officer, not made publicly or directly to plaintiff. Plaintiff requested copies of the DPS reports of Hastie's complaint and obtained those reports with some difficulty and long after the time of Hastie's complaint. Whether or not plaintiff's emotional distress by those statements was invited, the private and indirect character of Hastie's conduct makes it less likely to be classified as outrageous.

Given the nature of Hastie's conduct and the application of the relevant contextual factors, Hastie's actions were not extreme or outrageous. Plaintiff continued to

---

[6] The Supreme Court, in *Mandani v. Kendall Ford, Inc.*, 312 Or 198, 204, 818 P2d 930 (1991), cautioned that motive is not relevant to whether an act is outrageous or intolerable in character. We read the court's instruction to distinguish between the separate proofs required to prove the intent to cause emotional distress and outrageous conduct elements of the IIED tort. An ulterior motive to advance an unlawful or otherwise illegitimate end is relevant to whether conduct is extreme or outrageous and is a different fact issue than whether a defendant intends to cause severe emotional distress.

repeatedly contact Hastie after she asked to end their relationship and after she stated that his behavior was frightening her. Plaintiff sent e-card communications in case Hastie was blocking his e-mails to her, intending to communicate with her even if the contact was unwanted. Despite Hastie's demands to be left alone, plaintiff continued to suggest a friendship ("I'll always be here as a friend, Always!"), and begged for further interaction with Hastie ("if you really want to be nice you would tell what you thought (your opinion) about those CD's I gave you, pretty please"). At the same time, plaintiff was increasingly disrespectful to Hastie, calling her "childish," a "flake," "paranoid," "naive," and "presumptuous." No reasonable juror could find that Hastie or the university transgressed acceptable social boundaries by reporting that behavior to the campus or city police.

■    Similarly, the university's conduct in excluding plaintiff from the campus and enforcing that ban was neither outrageous nor extreme.[7] In the employment context, the Supreme Court held that a wrongful discharge from employment by itself was not the type of conduct that would support an IIED claim. *Mandani v. Kendall Ford, Inc.*, 312 Or 198, 204, 818 P2d 930 (1991). The court stated that the means of inflicting the injury must be "extraordinary," and a termination of employment lacked that quality. *Id.* The same result obtains here. The act of exclusion is not extraordinary by itself. It is a type of conduct that is ordinary and socially acceptable.[8] Moreover, there is nothing in the relationship between plaintiff and the university, the sensitivities of

---

[7] Plaintiff contends that the process used in issuing the exclusion order violated ORS 131.705 to 131.735 and that the inconsistency with law makes the exclusion outrageous. Those statutes allow exclusion of persons from public property during an emergency and on proclamation by the governor. ORS 131.705 to 131.735 do not apply to exclusions in nonemergency circumstances. Plaintiff's assertion that those statutes define the exclusive circumstances for excluding a person from public property is without merit. Plaintiff is also misguided in his claim that ORS 276.095 is relevant. That statute describes the authority of the Director of the Department of Administrative Services.

[8] One of the elements of the crime of criminal trespass is that a person "enter[ ] or remain unlawfully" in certain areas. ORS 164.245 (criminal trespass in the second degree); ORS 164.255 (criminal trespass in the first degree). Under ORS 164.205(3)(c), a person "enters or remains unlawfully" if the person enters "premises that are open to the public after being lawfully directed not to enter the premises." The statutes contemplate the exclusion of persons from property where they are not welcome.

plaintiff, or other material context to the exclusion that creates an issue of fact for a jury on whether that conduct was extreme and outrageous.

In sum, Hastie's conduct as a whole—reporting the unwanted contacts—was not extreme and outrageous as a matter of law, even though portions of her complaint might have been false or incomplete. The reporting was favored by statute. The false particulars were collateral to the core of the complaint. Most of the falsities were not particularly stigmatizing or likely to inflict severe emotional distress. The context of the false reporting promotes its classification as nonactionable. The university employed ordinary means to deal with Hastie's complaint. Therefore, the trial court did not err in granting defendants' motion for summary judgment.

Affirmed.

**EDMONDS, P. J.,** concurring.

I agree with the majority's conclusion that no reasonable juror could return a verdict for plaintiff on his claim for intentional infliction of emotional distress (IIED). I write separately to express my understanding of why this case is appropriately decided on summary judgment.

Plaintiff alleges in his complaint that "defendants have intentionally caused plaintiff to suffer extreme emotional distress by means of conduct that exceeds the bounds of social toleration," including "knowingly initiating a false report concerning plaintiff to a law enforcement agency[,]" and accusing plaintiff of "harassing/stalking" Hastie and "engaging in unwanted contacts." In my view, plaintiff's complaint alleges sufficient facts to state a claim for IIED and would withstand a motion to dismiss under ORCP 21 A.

Plaintiff, however, appeals from the grant of summary judgment, which, of course, implicates the provisions of ORCP 47. In part, ORCP 47 C provides:

"The court shall grant the motion if the pleadings, depositions, affidavits, declarations and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law. No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most

> favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment."

Plaintiff, in response to defendants' summary judgment motion, points to inaccuracies in the report that Hastie made to university officials about the circumstances of their contacts with each other and asserts, based on those alleged falsehoods, that it can be reasonably inferred that Hastie made a false report that plaintiff had been stalking her with the intent of causing him severe emotional distress. It follows, in plaintiff's view, that summary judgment is precluded because there exist genuine issues of material fact regarding the elements of his IIED claim.

In order to prevail on an IIED claim, a plaintiff must prove that "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of plaintiff's severe emotional distress, and (3) the defendant's acts constitute an extraordinary transgression of the bounds of socially tolerable conduct." *Sheets v. Knight,* 308 Or 220, 236, 779 P2d 1000 (1989). In *McGanty v. Staudenraus,* 321 Or 532, 550-51, 901 P2d 841 (1995), the court reconsidered the common-law rule regarding the level of intent necessary to establish IIED and adopted comment i of the *Restatement (Second) of Torts* section 46 (1965) as Oregon's definition of the "intent" element of an IIED claim: "The rule stated in this Section applies where the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct."

Thus, the issue in this case is whether defendants are entitled to judgment as a matter of law in light of the evidentiary record before the trial court. In my view, there exist reasonable inferences from the record that create genuine issues of material fact regarding the second and third elements of the tort. In particular, as to the third element, a reasonable juror could find that the filing of a false report by Hastie that plaintiff had been stalking her constituted an extraordinary transgression of socially tolerable conduct because, in the abstract, the filing of a false report of stalking

is that kind of conduct. *See, e.g.*, *Hall v. The May Dept. Stores*, 292 Or 131, 139, 637 P2d 126 (1981) (holding that a security supervisor's accusations made regardless of an actual belief as to guilt or innocence that accused the plaintiff of stealing money and threatened her with prosecution and imprisonment in a manner designed to frighten her were actionable in the context of an IIED claim). In other words, filing a report that wrongfully accuses a person of stalking will generally be the kind of conduct that is significantly stigmatizing to a person's reputation or character.

Where plaintiff's evidence fails, however, is with regard to the first element—the absence of evidence or a reasonable inference that defendants intended to cause plaintiff severe emotional distress. As to that element, plaintiff seeks to draw an inference from the inaccuracies in Hastie's report of the contacts with him by arguing that based on those inaccuracies, there is a reasonable inference that Hastie lied to the police with the intent of inflicting emotional distress on him. Section 8A of the *Restatement* provides guidance with respect to plaintiff's argument. Specifically, the *Restatement* defines the word "intent" with respect to intentional torts:

> "The word 'intent' is used throughout the Restatement of this Subject to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it."

Comments a and b to section 8A provide:

> "*a.* 'Intent' as it is used throughout the Restatement of Torts, has reference to the consequences of an act rather than the act itself. When an actor fires a gun in the midst of the Mojave Desert, he intends to pull the trigger; but when the bullet hits a person who is present in the desert without the actor's knowledge, he does not intend that result. 'Intent' is limited, wherever it is used, to the consequences of the act.

> "*b.* All consequences which the actor desires to bring about are intended, as the word is used in this Restatement. Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still

goes ahead, he is treated by the law as if he had in fact desired to produce the result."

First, as the majority correctly points out, there is no direct or circumstantial evidence in the record that Hastie or the other defendants desired to cause plaintiff severe emotional distress as a consequence of their actions. The evidence is susceptible only to an inference that Hastie believed that she was being stalked and that the other defendants acted to protect her from plaintiff. That absence of evidence or inference places plaintiff in the position of having to demonstrate that defendants' mental state falls within the parameters of comment b to section 8A of the *Restatement*. In other words, plaintiff must demonstrate that Hastie and the other defendants knew that the acts that they undertook were certain or substantially certain to cause him severe emotional distress. An example of where the intent element for an IIED claim could be proved based on the nature of the conduct itself is found in *Rockhill v. Pollard*, 259 Or 54, 485 P2d 28 (1971), where a physician forced an injured child to wait outside his office in a freezing temperature with clothing and a blanket wet with vomit until someone came to pick the child up. Those are the kind of circumstances in which a defendant would know with substantial certainty that his conduct would cause severe emotional distress.

When the entire evidentiary record before us is considered, the circumstances of this case are not the kind of circumstances from which an actor would know that the consequence of severe emotional distress was certain or substantially certain to result from his or her actions. Indeed, given the belief of Hastie and the other defendants that she was being stalked by plaintiff, a person in their shoes would believe the antithesis. Moreover, what makes this case unusual on its facts is that, after December 1, 2003, plaintiff was on notice that his continued contacts with Hastie were unwanted by her, long before Hastie took any formal action. At a later time and after plaintiff began attending the exercise class for which she was an instructor, she reiterated that position to him. In turn, plaintiff's response to Hastie's rejection of him throughout the entire time period was to persist in continuing the unwanted contacts, a response that ultimately led to Hastie contacting the university's Department

of Public Safety. Plaintiff points to no other evidence on which to base a reasonable inference that Hastie knew that the consequence of reporting plaintiff's actions to the authorities was certain or substantially certain to cause plaintiff severe emotional distress.

Also at play in this case are competing public policies. On the one hand, the law classifies conduct as "tortious" when it is predicated on an improper or wrongful motive. On the other hand, the law encourages those who believe that they are in physical danger from unwanted contact to seek redress from the proper authorities for their own protection. The policies favoring the reporting of conduct like plaintiff's necessarily must afford some latitude. It would be counter intuitive to the policies that those laws promote to authorize a common-law tort action in which people could be held liable for seeking to protect themselves from a perceived threat of harm because the contents of their report had been embellished in part or a full disclosure had not been made.

Ultimately, then, the question becomes what role the inferences that arise from the allegedly inaccurate portions of Hastie's reports play under ORCP 47 C. Under the rule, the "materiality" of a disputed fact or inference is judged by whether an objective reasonable juror could return a verdict for the adverse party based on that fact or inference. This case is, on its peculiar facts, the kind of case on which no reasonable juror could return a verdict for plaintiff when the entire summary judgment evidentiary record is considered in context with plaintiff's allegations.

For these reasons, I concur in the majority's result.[1]

---

[1] The point of expressing these observations in connection with the majority opinion is this: I would hold that false reports of stalking behavior will always have the effect of substantially stigmatizing a plaintiff's character or reputation and therefore could be socially intolerable. However, whether the making of false reports of stalking will render their authors liable for the tort of IIED depends on whether a plaintiff can prove all of the elements of the claim. While Hastie's report of plaintiff's conduct consisted of statements by her that had the effect of substantially stigmatizing plaintiff's character or reputation, those statements did not expose her to liability for IIED merely because they may have been false in some respects.