Argued and submitted October 27, 2022, affirmed May 3, petition for review denied August 31, 2023 (371 Or 332)

Von WECKER,
*Plaintiff-Appellant,*

*v.*

SALEM CLINIC, P.C.,
an Oregon professional corporation,
*Defendant-Respondent.*

Marion County Circuit Court
19CV07154; A175655

529 P3d 991

In this civil action arising from defendant's termination of the parties' physician-patient relationship, plaintiff contends the trial court erred by granting summary judgment and dismissing three claims: negligence, breach of implied contract, and intentional infliction of emotional distress (IIED). Plaintiff argues that a claim of negligent termination of a physician-patient relationship exists within the context of professional malpractice and that defendant's termination of their relationship was negligent under the applicable standard of care. Plaintiff next argues that, based on defendant's own internal policies, the parties created an implied-in-fact contract that defendant broke by terminating the relationship. Finally, plaintiff argues that by failing to issue a decision on his request to reconsider the termination, and mistakenly sending a letter asking him to make an appointment, defendant's conduct was extreme and outrageous such that it rose to the level of IIED. *Held*: The trial court did not err in dismissing any of the three claims. Assuming that a negligent termination claim can exist within the ordinary malpractice framework, the record did not contain evidence allowing for an objectively reasonable jury to find that defendant's termination of the relationship was negligent. Furthermore, because there is no evidence that plaintiff had knowledge of defendant's internal policies or that there was a mutual agreement between the parties based on those policies, no rational fact finder could determine that there was an implied-in-fact contract between the parties. Finally, defendant's failure to follow its own policies regarding patient appeals and mistakenly sending plaintiff an automatically generated letter asking him to schedule an appointment was not extreme and outrageous conduct as a matter of law.

Affirmed.

Jennifer K. Gardiner, Judge pro tempore.

Kevin T. Lafky argued the cause for appellant. Also on the briefs were Amanda L. Reilly and Lafky & Lafky.

Kim E. Hoyt argued the cause for respondent. Also on the brief was Garrett Hemann Robertson P.C.

Before Aoyagi, Presiding Judge, and Joyce, Judge, and Jacquot, Judge.*

JACQUOT, J.

Affirmed.

_____

	* Jacquot, J., *vice* James, J. pro tempore.

**JACQUOT, J.**

Plaintiff Von Wecker brought this civil action against defendant Salem Clinic, P.C., after defendant terminated the parties' physician-patient relationship. The trial court granted summary judgment for defendant and issued a limited judgment of dismissal on three of plaintiff's four claims: negligence, breach of implied contract, and intentional infliction of emotional distress (IIED). On appeal, plaintiff raises three assignments of error, contending that the trial court erred by granting summary judgment on each claim. Because we agree with the trial court that no reasonable juror could return a verdict in favor of plaintiff on any of the three claims at issue, we affirm.

"We review a trial court's grant of summary judgment for errors of law and will affirm if there are no genuine disputes about any material fact and the moving party is entitled to judgment as a matter of law." *Thompson v. Portland Adventist Medical Center*, 309 Or App 118, 121, 482 P3d 805 (2021). "No genuine issue as to a material fact exists if *** no objectively reasonable juror could return a verdict for the adverse party[.]" ORCP 47 C. We view the facts and all reasonable inferences that can be drawn from those facts in the light most favorable to plaintiff as the nonmoving party. *A. B. v. The Oregon Clinic*, 321 Or App 60, 63, 515 P3d 387 (2022).

*Negligence claim.* As we understand it, the trial court ruled that Oregon law does not recognize a claim for medical malpractice for negligent termination of the physician-patient relationship *under the facts of this case*, and that no reasonable juror could conclude that defendant was negligent in terminating the relationship here. Although the court did state, "The facts as they are stated, *** as Oregon law exists today, do not state a cognizable cause of action," it also engaged in detailed consideration of the facts, noting the following undisputed facts:

- Plaintiff signed a pain contract that warned that violations of its terms would result in termination of the physician-patient relationship;

- Plaintiff understood the terms of the contract;

- Plaintiff violated the contract by using hydrocodone that was not prescribed to him;

- Defendant sent plaintiff a letter telling him he was terminated as a patient;

- The letter urged plaintiff to seek a new physician right away and assured him that the clinic would continue to provide medical care for his urgent needs for 31 days after the mailing of the letter;

- Plaintiff did not seek care claiming he had an urgent need;

- Plaintiff did not provide evidence that he had suffered any medical emergency between the time he was terminated as a patient and securing a new physician;

- Plaintiff found a new physician within six weeks of starting to look for one, and defendant transferred plaintiff's records; and

- Defendant continued to prescribe medications for diabetes and high blood pressure until plaintiff was under the care of a new physician.

On appeal, plaintiff urges us to hold that a claim of negligent termination of a physician-patient relationship exists within the context of professional malpractice, and he contends that defendant breached its duty of care by failing to provide "adequate notice" of termination to establish care with another provider, failing to provide resources to assist him in doing so, failing to provide nonurgent medical care until he did so, failing to afford him a fair and reasonable opportunity to appeal the termination, and failing to make appropriate efforts to "educate or motivate" him into compliance with the pain contract before terminating him. He urges the court to determine this by applying the aspirational statements in the American Medical Association's (AMA) Code of Medical Ethics chapter 1.1.5 and the Oregon Medical Board's (OMB) Statement of Philosophy.

Assuming without deciding that a negligent termination claim can exist within our ordinary malpractice

framework, we agree with the trial court that plaintiff offered no evidence that defendant's termination was negligent. Even assuming the OMB and AMA guidelines set the standard of care for patient termination in Oregon—a point that we do not decide—the evidence in the record supports the trial court's determination that defendant complied with them in the present case and that there was no genuine issue of material fact on this record.

OMB instructs physicians on ending the physician-patient relationship in its "Statement of Philosophy." *See Statement of Philosophy: Ending the Patient-Physician Relationship*, Oregon Medical Board (July 2008), https://www.oregon.gov/omb/board/Philosophy/Pages/Ending-the-Patient-Physician-Relationship.aspx (accessed Sept 29, 2021).[1] OMB provides that, when ending the patient relationship for reasons such as the one here, the physician should give the patient "adequate notice" to allow time to establish alternative care, which should be "at least 30 days except under special circumstances." *Id.* Varying periods of time may be necessary in instances including a potential lack of provider availability or disruptive, threatening, or dangerous patients. *Id.* Further, the physician should, if possible, provide resources that might assist the patient in establishing alternative care but does not have to refer the patient to a specific provider, and the physician should facilitate the transfer of medical records. *Id.* The AMA's Code of Medical Ethics chapter 1.1.5 instructs that "[w]hen considering withdrawing from a case," physicians must "[n]otify the patient *** long enough in advance to permit the patient to secure another physician" and "[f]acilitate transfer of care when appropriate." *Terminating a Patient-Physician Relationship*, AMA Code of Medical Ethics chapter 1.1.5, https://www.ama-assn.org/system/files/code-of-medical-ethics-chapter-1.pdf (accessed Apr 24, 2023).

It is undisputed that defendant notified plaintiff that it was terminating the physician-patient relationship

---

[1] OMB amended its guidance in October 2022. *See Statement of Philosophy: Ending the Patient-Physician Relationship*, Oregon Medical Board (updated October 2022), https://www.oregon.gov/omb/board/Philosophy/Pages/Ending-the-Patient-Physician-Relationship.aspx (accessed Apr 24, 2023). The parties rely on the original language on appeal, as was done below. Accordingly, we refer to the original language throughout this opinion.

for his failure to abide by the agreed upon terms of a pain medication contract. The notification letter explained:

> "If you have an urgent need requiring medical attention, [defendant] will be available to you for thirty one (31) days following placement of this correspondence in the [US] mail \*\*\*. Please place yourself under the care of another physician without delay. With your written approval, we will forward all medical records to the physician of your choice. We have enclosed a medical records release form for your convenience."

It is also undisputed that defendant provided plaintiff with prescription renewals for his chronic high blood pressure and diabetes until he established alternative care and supplied him with all other necessary prescriptions until the end of the 31 days—except for an antidepressant, which plaintiff said he did not have "after a period of time" and did not renew. Thus, in accordance with both the OMB and AMA guidelines, defendant ensured that plaintiff's chronic physical conditions were maintained until he was able to establish a new provider and afforded him at least 30 days to secure alternative care for his pain and other conditions. Plaintiff asserts that defendant was required to provide him with "nonurgent" care but does not identify any nonurgent needs that went unaddressed, nor did he seek care (urgent or otherwise) during the interim from defendant or any other provider.[2] To the extent that plaintiff contends that the notice was inadequate because he did not establish new care within 30 days, we note that plaintiff did not begin his search for a new primary care provider until March 2017, despite receiving notice of his termination approximately two months earlier.[3] As such, defendant gave

---

[2] We note that the vast majority of courts that recognize a claim for negligent termination of the physician-patient relationship uniformly hold that there is an actionable claim only if the physician failed to provide reasonable notice *and* failed to be available to treat the patient who was critically ill and in need of emergency medical care. *See, e.g.*, *King v. Zakaria*, 280 Ga App 570, 574, 634 SE 2d 444, 448 (2008); *Newman v. Sonnenberg*, 2003 UT App 401, ¶ 11 n 3, 81 P3d 808, 812 (2003); *Magna v. Elie*, 108 Ill App 3d 1028, 1034, 439 NE 2d 1319, 1323 (1982); *Katsetos v. Nolan*, 170 Conn 637, 654, 368 A 2d 172, 182 (1976). Other courts recognize a claim only if the patient *sought care* with the defendant and *was refused* without being given reasonable time to find another provider. *See, e.g.*, *Mayer v. Baisier*, 147 Ill App 3d 150, 160, 497 NE 2d 827, 833 (1986).

[3] Plaintiff was trying to appeal the decision, but success was by no means assured.

plaintiff adequate notice of termination, and plaintiff has not shown that any special circumstances that may have been present here—such as any lack of access to providers or particularly rare health conditions—were not properly taken into account.

Furthermore, neither the OMB nor the AMA guidelines provide that a physician is *required* to provide resources to help a patient establish alternative care in terminating the patient. Likewise, neither set of guidelines suggest that physicians are required to afford patients an appeal process or make efforts to "educate or motivate" patients into compliance with patient responsibilities before terminating the relationship. Defendant's own internal processes on those matters therefore went well beyond any standard of care that we are assuming *arguendo* is established by the OMA and AMA guidance in terminating the physician-patient relationship.

On this record, we agree with the trial court that no objectively reasonable juror could find that defendant breached any duty of care it may have owed plaintiff in terminating the relationship. Although the trial court could have been clearer that it was applying the medical malpractice framework to the facts of this case, we are persuaded that it was applying that framework, and plaintiff provided no evidence to show that defendant breached any duty that was owed to him under any professional standard he cited. Accordingly, defendant was entitled to judgment as a matter of law on the negligence claim.

*Breach of implied contract claim.* Plaintiff next contends that the trial court erred in granting summary judgment for defendant on the contract claim, because the parties had an implied-in-fact contract "whereby defendant agreed to continuously provide medical services to plaintiff in exchange for monetary compensation." In plaintiff's view, because his previous physician spoke with him after his pain contract violation in 2009 to explain why he could be terminated and how to avoid it, and because defendant's own internal policies stated that a patient can appeal a termination and that efforts should be made to get the patient into compliance with his or her treatment responsibilities,

the parties created an implied-in-fact contract under which defendant was required to "educate or motivate" him into complying with the pain contract and provide him with a "fair and meaningful opportunity to appeal" before terminating him.

We disagree. "An implied-in-fact contract, like any other contract, must be founded upon the *mutual agreement and intention of the parties.*" *Moyer v. Columbia State Bank*, 315 Or App 728, 737, 503 P3d 472 (2021) (internal quotation marks omitted; emphasis added). Unlike an express contract where an agreement is formed based on words, in an implied contract, the parties' agreement is inferred, in whole or in part, from their conduct. *Id.* at 737-38. Thus, to survive summary judgment on an implied-contract claim, the record must permit a reasonable factfinder to find that "the *parties' acts* warrant the conclusion that the parties had a *mutual agreement.*" *Id.* at 738 (emphases added).

Here, the record is silent on whether plaintiff had any knowledge of defendant's internal policies until *after* he brought his breach of contract claim. And without plaintiff's knowledge of those policies, there could be no mutual agreement between the parties regarding their respective obligations and expectations based on those policies. Further, we disagree with plaintiff that because he was previously warned by his physician that the relationship was in jeopardy and advised on how to avoid termination, a reasonable factfinder could conclude that the parties mutually agreed that he would be given the same courtesy after future violations before defendant could terminate the relationship. If anything, it further supports that the parties understood that defendant could terminate the relationship for any future violations. Ultimately, on the record before us, we conclude that no reasonable juror could find that an implied contract was created here. The trial court therefore properly granted summary judgment on plaintiff's claim.[4]

---

[4] Even if an implied contract could have been created by defendant's conduct, that contract would have been precluded by the terms of the express pain contract. *See Uptown Heights Associates v. Seafirst Corp.*, 320 Or 638, 647, 891 P2d 639 (1995) (an express written contract precludes any implied terms or agreements that conflict with the express contract). The express pain contract—which plaintiff was a party to—permitted defendant to terminate the relationship for any violation of its terms and did not require that any efforts be made to "educate

*IIED.* Lastly, plaintiff contends that the trial court erred in granting summary judgment on the IIED claim because a rational factfinder could conclude that defendant's conduct in terminating plaintiff's status as a patient, including its conduct after issuing the termination letter, was an "extraordinary transgression of the bounds of socially tolerable behavior." In addition to the undisputed facts described above, plaintiff relies on his claim that he sent a letter requesting that the clinic reconsider terminating him given the reasons he used the unauthorized medication, and defendant never issued a decision on that request. Additionally, plaintiff complains that the clinic mistakenly sent him a letter asking him to set an appointment after he was terminated as a patient but during the 30-day window. The last fact plaintiff cites in support of his IIED claim is his assertion that the clinic failed to further warn him that use of controlled substances other than those prescribed to him would cause termination before going forward with actually terminating his right to receive care at the clinic.[5]

An IIED claim requires plaintiff to prove three elements: (1) that defendant intended to cause plaintiff severe emotional distress or knew with substantial certainty that its conduct would cause such distress; (2) that defendant engaged in outrageous conduct, *i.e.*, conduct extraordinarily beyond the bounds of socially tolerable behavior; and (3) that defendant's conduct in fact caused plaintiff severe emotional distress. *House v. Hicks*, 218 Or App 348, 357-58, 179 P3d 730, *rev den*, 345 Or 381 (2008). To find liability on an IIED claim, the defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 358 (citing *Restatement (Second) of Torts* § 46 comment d (1965)). A

---

or motivate" plaintiff into complying with its terms or provide him with an appeal before terminating him. *See Kizer Excavating v. Stout Building Contractors*, 324 Or App 211, 218, 525 P3d 883, *adh'd to as modified on recons*, 325 Or App 642, 529 P3d 1024 (2023) ("If a dispute is governed by an express contract, no contract will be implied either in fact or in law, and the terms of the express contract control.").

[5] Another physician at the clinic had given plaintiff a prior warning in person when he violated the pain contract in 2009, but the actual pain contract clause that plaintiff signed and was aware of allows termination for any violation of its terms.

special relationship, such as a physician and a patient, is the most important factor in classifying conduct as extreme and outrageous. *Id.* at 360. However, whether conduct is extreme and outrageous is a fact-specific inquiry that we must consider on a case-by-case basis. *Id.* at 358.

On this record, we conclude that the decision to terminate plaintiff with adequate notice to establish alternative care is not "outrageous" conduct as a matter of law.[6] *Cf. id.* at 367 (concluding that the defendants' conduct of reporting unwanted contacts and excluding the plaintiff from university campus was not extreme and outrageous conduct as a matter of law); *Rosenthal v. Erven*, 172 Or App 20, 28, 17 P3d 558 (2001) (concluding that, as a matter of law, the defendant's conduct of having a consensual extramarital relationship with the plaintiff's wife was not an extraordinary transgression of the bounds of socially tolerable conduct). Viewed in the light most favorable to plaintiff, defendant's conduct is not "extreme and outrageous." Defendant's alleged failure to follow its own internal policies, by failing to issue an additional warning before terminating him and failing to issue an appeal decision in response to a letter that he sent after the decision was already made, does not make it so. Similarly, if defendant mistakenly sent plaintiff an automatically generated letter asking him to schedule an appointment after the termination, that is unfortunate, but not outrageous, and any confusion that letter may have created was cleared up when plaintiff called to set the appointment and was informed that it was a clerical error and that he was still terminated as a patient.

Affirmed.

---

[6] Defendant asserts that plaintiff failed to challenge the trial court's "ruling" that defendant "did not act in a way that they intended to inflict severe emotional distress." The "ruling" before us is the summary judgment ruling. To the extent defendant is challenging preservation, we reject that argument.