Argued and submitted May 23, affirmed December 24, 2008

Erica SCHOEN,
*Plaintiff-Respondent,*

*v.*

FREIGHTLINER LLC,
a Delaware corporation,
*Defendant-Appellant.*

Multnomah County Circuit Court
040302555; A130589

199 P3d 332

James N. Westwood argued the cause for appellant. With him on the briefs were Stoel Rives LLP, Jeffrey M. Kilmer, and Kilmer, Voorhees & Laurick, P.C.

Scott N. Hunt argued the cause for respondent. With him on the briefs were Richard C. Busse, Matthew B. Duckworth, and Busse & Hunt.

David Wilson and Bullard Smith Jernstedt Wilson filed the brief *amicus curiae* for Associated Oregon Industries.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

ROSENBLUM, J.

ROSENBLUM, J.

A jury found defendant, plaintiff's employer, liable for intentional infliction of severe emotional distress. Defendant appeals, assigning error to the denial of its motion for a directed verdict. Defendant asserts that plaintiff failed to adduce sufficient evidence of outrageous conduct or of intent to inflict severe emotional distress. Defendant also argues that plaintiff's emotional distress was not a reasonable response to its conduct. We conclude that there is sufficient evidence in the record from which the jury could have found the facts necessary to establish the elements of plaintiff's claim. *See York v. Bailey*, 159 Or App 341, 349, 976 P2d 1181, *rev den*, 329 Or 287 (1999) (stating standard of review for denial of a motion for directed verdict). We therefore affirm.

In reviewing the denial of defendant's motion for directed verdict, we state the facts, including all reasonable inferences, in the light most favorable to plaintiff, the non-moving party. *Id.* Defendant is a manufacturer of heavy-duty trucks. Defendant, which is self-insured for workers' compensation purposes, has a policy of trying to put employees with work-related injuries to work in a light-duty capacity until they become medically stationary, rather than placing them on disability leave. Employees on light-duty work receive the same wages and benefits that they earn doing regular work. Defendant has a policy preference for giving injured employees light-duty work on the production floor, but, if no work is available within a particular employee's medical restrictions, then the employee is assigned to the nurse's station at the manufacturing plant. The nurse's station is operated by Rosemary Rasmussen, an occupational health nurse employed by defendant. Defendant encourages managers and supervisors to notify the nurse's station when they have light-duty tasks available on the production floor so that injured employees in the nurse's station can be assigned to do that work.

When an injured employee becomes medically stationary, defendant determines whether a regular job is available within the medical restrictions, if any, that the employee still has. If no suitable jobs are available at that point, then

the employee receives workers' compensation disability benefits and does not continue to work at the plant, even in a light-duty capacity.

Plaintiff began working full time for defendant in 1988 in various aspects of truck production. In 2002, she began to experience repetitive-motion shoulder pain in her right shoulder, which led to her filing a workers' compensation claim and ultimately having surgery in July 2003. Plaintiff did not work for three months after the surgery. The injury did not heal as quickly as plaintiff had hoped, which caused her distress. Plaintiff had other stressors in her personal life and was taking antidepressant medication. Defendant was not aware of plaintiff's medication or the problems in her personal life.

Plaintiff was released to return to work in a light-duty capacity on October 6, 2003. By doctor's order, the work that she could perform was very restricted; she was ordered not to lift more than one pound and to do no pushing, pulling, or overhead work. Before plaintiff returned, a clerical worker in the nurse's station, Jennifer Marple, sent an e-mail to plaintiff's supervisor, Mike Calkins, telling him that, when plaintiff returned, he should not assign her any work: "When [plaintiff] comes back to work[,] under no circumstance, should she cry, whine, beg, plead with you to find her something to do that's meaningful, productive, any kind of job, tell her you have nothing for her. You have no work for her to do." Plaintiff was instructed to report to the nurse's station, where she would be assigned light duty jobs until she was medically stationary.

When plaintiff returned, Rasmussen told her to report to, and work for, Marple. Marple, whom plaintiff had never met before, was unpleasant and hostile toward her from the beginning. She told plaintiff that she was her boss and that plaintiff would have to go wherever Marple wanted. Marple called plaintiff "worthless" almost daily, often in front of other employees. On at least one occasion, she referred to plaintiff as "Ms. Thing." Rasmussen's desk was only 10 to 12 feet from Marple's desk, so she was within earshot when Marple called plaintiff names.

Plaintiff's first assignment was to clean and organize a filing room, which involved moving 25- to 30-pound filing boxes by herself. After the first day, plaintiff told Marple that it exceeded her medical restrictions. Marple told her to use a rolling cart for any boxes that she didn't want to carry, but plaintiff still had to lift the boxes onto the cart. After three days, plaintiff complained to her shop steward that she was working beyond her restrictions and that her arm was getting sore. The shop steward talked to Marple about it. She pulled plaintiff off the job, but was angry and complained loudly about the steward's intervention. Plaintiff spoke with her doctor about the matter, and he faxed even more severe work restrictions to the nurse's station.

On another occasion, plaintiff was assigned to a light-duty assembly job putting plastic washers on bolts, but the particular washers she was assigned to put on were very tight and required her to push very hard with her thumbs, which led to soreness in her shoulder. Other assembly work was available that did not require that kind of exertion. Plaintiff did not complain about the soreness to anyone, and she had assembled more than 2,000 bolts and washers before she was allowed to take a break. At that point, she could not move her shoulder any more.

Plaintiff was assigned to sell snacks to other employees on the production floor to raise money for a charity,[1] something that was not routinely assigned to other people. Plaintiff was assigned that job at least two or three times a week, and sometimes every day of the week. Plaintiff's coworkers made insulting and malicious remarks to plaintiff when she performed the job, such as, "get a job," "lazy bitch," and "worthless." It was apparent to other employees that plaintiff was not happy with the assignment. Plaintiff told Marple what was going on and that it was humiliating, but Marple only responded by telling her, "get hustling and get it done." Once, she suggested that plaintiff wear a low-cut shirt the next day so she would increase her sales.

---

[1] Profits from the sales went to a fund intended to help the families of employees in financial need.

Marple also ordered plaintiff to circulate a "football pool" and to collect bets on the pool, despite plaintiff's protests that it was illegal. Marple ordered plaintiff to place the first bet to get the pool started. Plaintiff complained to Rasmussen about the pool being illegal, but Rasmussen simply told her to avoid defendant's human resources manager, Trudy Houghton, so that she would not get into trouble.

Marple and Rasmussen essentially used plaintiff as a personal servant, ordering her to get snacks, sodas, and lunches for them, including going off the premises to get lunches on two occasions, which violated company rules. They never reimbursed plaintiff or even thanked her for buying their food. They also assigned plaintiff tasks, such as making posters for health-awareness events, that were meant to help Rasmussen earn a bonus and were not supposed to be done on company time. Plaintiff did some of the work on her own time and some in the nurse's station. When she was working on the projects in the nurse's station, Marple and Rasmussen would warn her to hide the work whenever Houghton was coming, so they would not get into trouble.

When plaintiff complained about the assignments she was getting, Marple told her that, if she had a problem with them, Marple would require her to pick up garbage with a poker stick in front of everyone all around the plant. Plaintiff protested that the assignment would be "just to humiliate [her]." Marple told plaintiff, "Well, then you'll do what I tell you to do or I'll have you do that," adding that she had made another employee do it before and that he was so embarrassed that his injury improved thereafter. Marple also threatened to put plaintiff at what she called the "table of shame," a table in front of the cafeteria windows where she would be "paraded" in front of the other employees and where, according to Marple, "all the worthless workers go." Marple never actually followed through on those threats.

Plaintiff attempted to find work on the production floor on her own. She spoke to her former supervisor, Calkins, and complained to him nearly every day about the assignments she was being given and the treatment she received in the nurse's station. She told him, "[Y]ou've got to

get me out of here." Calkins initially told her that he had work that she could do but that he could not assign it to her, citing the e-mail he had received from Marple before plaintiff had returned to work. He eventually did give her some work, but on one occasion he told plaintiff that she had to return to the nurse's station because Marple had called and said that she had a "shameful" job for plaintiff and that plaintiff had only "so many minutes" to get back to the nurse's station. He eventually talked to Houghton about the fact that Marple and Rasmussen would not allow plaintiff to work on the production floor, but, despite defendant's usual policy of encouraging supervisors to find light-duty work for injured employees, she told him to mind his own business and "butt out."

Plaintiff spoke with other supervisors and was assigned other tasks on the production floor, where she wanted to be. For a period of about four weeks, she was able to do paint inspection nearly every day, but Marple sometimes pulled her from the work to do other tasks at the nurse's station, including those that were meant to help Rasmussen earn a bonus.

For several days, plaintiff was required to sit in a chair in the nurse's station and do nothing for her entire eight-hour shift. On one occasion, when plaintiff was performing light-duty work for Calkins, Marple called her back to the nurse's station and made her sit in the chair doing nothing for the rest of the day. On another occasion, plaintiff was ordered to sit and guard cookies at a bake sale, which drew derisive comments from passing coworkers. At one point, about twice a week, a supervisor came to the nurse's station and asked for plaintiff to do paint inspection. Although plaintiff was sitting in a chair doing nothing, Marple and Rasmussen turned down his request—apparently so they could have her do Rasmussen's "bonus" work.

Things came to head in late February 2004, nearly five months after plaintiff had returned to work following her surgery. Plaintiff talked to Houghton, the human resources manager, and told her how Marple and Rasmussen had been treating her. She told Houghton that she was being treated "unethically," being used as a "personal assistant" or "slave,"

having to do things like the football pool behind management's back, having to buy lunches and spend money without being reimbursed, and having to do work on her own time. She also told Houghton about the threats that Marple had made to her. Houghton, who was close friends with Rasmussen and Marple, seemed surprised and said that she would "check into it."

Plaintiff then told Houghton that another employee with less seniority who had a similar shoulder injury was being allowed to work overtime, and she asked Houghton that she also be allowed to work overtime. Houghton declined and then, smiling at plaintiff, told her, "[W]e have no work for you. Frankly, I have talked to everybody, including supervisors, managers, foremen. I have talked to everybody. I really have[.]" She then said, "Nobody wants you. You're worthless. We build trucks down here. You know, your right arm—what are you—nobody wants you." She continued to repeat that plaintiff was worthless and "I don't know what you're going to do." Plaintiff became hysterical and left Houghton's office; she eventually left work early. She sought medical care that night and was referred the next day to a psychiatrist, under whose care she remained through trial.

The next day, Houghton called plaintiff and told her not to come to work, saying, "We don't have anything for you." Plaintiff did not work again until July 2004. Instead of a regular paycheck, she received advances on her permanent partial disability award. In July, she returned to work and wiped trucks down. She was supposed to do the job using only her good arm, but, according to plaintiff, to meet production expectations, she had to use her right arm. After four weeks, she was taken off the job because it hurt her shoulder. She was then given a data entry job but received no training on how to do it. Houghton, the plant manager, and plaintiff's supervisor would stand behind her looking over her shoulder for extended periods of time, which she found intimidating. Any time plaintiff asked a question, her supervisor would tell her, "No more talking." Plaintiff found the job to be very stressful because she did not know what she was doing. She eventually went on medical leave in December 2004.

Plaintiff commenced this action on March 10, 2004, asserting claims for workers' compensation discrimination and intentional infliction of severe emotional distress (IIED). In an amended complaint, plaintiff alleged that she was entitled to punitive damages for both claims. When plaintiff finished presenting her case-in-chief, defendant moved for a directed verdict on her claims. The trial court denied the motion. Defendant renewed the motion at the close of all of the evidence, and the court again denied it, stating, "There's conflicting testimony that raises credibility issues, which are always the province of the jury to resolve." Defendant then moved to strike the claim for punitive damages. Noting that punitive damages are "reserved for the most outrageous, egregious activity," the court concluded that such activity "is not found in the evidence in this case, particularly by a clear and convincing evidence standard." It granted the motion to strike the punitive damages claim.

The case was then submitted to the jury. With respect to the IIED claim, seven fact specifications went to the jury. Plaintiff alleged that defendant (1) intentionally worked her beyond her restrictions; (2) denied her productive work; (3) assigned her to do work for the purpose of causing her to be humiliated, even when productive work was available; (4) told her that, if she did not like the treatment she was receiving, then defendant would have her pick up garbage; (5) threatened to make her work at the "table of shame"; (6) repeatedly called her "worthless" when she protested the pattern of treatment; and (7) referred to her as "Miss Thing." The jury returned a verdict in defendant's favor on the discrimination claim, but it found for plaintiff on the IIED claim and awarded her $250,000 in damages.

After the jury returned its verdict, defendant filed a motion for judgment notwithstanding the verdict (JNOV) or, alternatively, for a new trial. The court denied the motion and entered a judgment reflecting the jury's verdict.

On appeal, defendant assigns error to the denial of its motion for a directed verdict on the IIED claim.[2] In reviewing

[2] Defendant does not assign error to the trial court's denial of its motion for a new trial.

the denial of a motion for directed verdict, we review the record to determine whether there is sufficient evidence from which the jury could have found the facts necessary to establish the elements of the claim. *York*, 159 Or App at 349. To prevail on a claim for IIED, a plaintiff must show (1) that the defendant intended to cause the plaintiff severe emotional distress or knew with substantial certainty that its conduct would cause such distress; (2) that the defendant's conduct in fact caused the plaintiff severe emotional distress; and (3) that the defendant engaged in outrageous conduct, that is, conduct extraordinarily beyond the bounds of socially tolerable behavior. *House v. Hicks*, 218 Or App 348, 357-58, 179 P3d 730, *rev den*, 345 Or 381 (2008).

Defendant argues that plaintiff failed to establish any of the three elements. With respect to the first element, defendant argues that plaintiff failed to establish that any of its conduct was intended to cause severe emotional distress or that defendant knew that its conduct would cause such distress. Specifically, defendant argues that there is insufficient factual support in the record for the allegations that it intentionally worked plaintiff beyond her restrictions, denied her productive work, and assigned her work for the purpose of causing her humiliation. It argues that any intent that Marple may have had to inflict distress cannot be attributed to defendant, because Marple was not a managerial employee. With respect to the second element, defendant acknowledges that there is evidence from which the jury could have found that plaintiff suffered severe emotional distress, but it contends that, even assuming that the alleged conduct actually occurred, it would not cause a *reasonable* person to suffer severe emotional distress and, thus, that plaintiff's distress is not actionable. Finally, with respect to the third element, defendant argues that all of the specifications of conduct submitted to the jury fall short of the "outrageous conduct" standard required to support liability for IIED.[3]

---

[3] Defendant and *amicus* Associated Oregon Industries also argue that plaintiff did not complain about being mistreated to anyone in a position to do something about it—that is, to anyone in management—suggesting that allowing an IIED claim to go forward in such circumstances would create undue difficulties for employers. Plaintiff contends that Oregon law does not require an employee to complain to management before asserting an IIED claim against an employer. We

In response, plaintiff first raises two preservation challenges. She argues that defendant failed to assert at trial that Marple was not a management employee and thus that her intent cannot be attributed to defendant. She also argues that defendant failed to preserve the issue of the reasonableness of her response to defendant's conduct. On the merits, she disputes defendant's contention that a "reasonable person" standard applies to determining whether severe emotional distress is actionable. Plaintiff also contends that, viewing the record in the light most favorable to her, there is sufficient evidence that defendant either intended to cause severe emotional distress or knew that it was substantially certain to occur. She also argues that the jury could reasonably find that defendant's conduct was extraordinarily beyond the bounds of socially tolerable behavior.

■    We begin with plaintiff's argument that defendant failed to preserve the contention that Marple's intent cannot be attributed to defendant. To preserve a claim of error for appeal, "a party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted." *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000). Defendant did not argue to the trial court that the intent element could not be satisfied by evidence that Marple intended to inflict severe emotional distress. Accordingly, we consider evidence of Marple's intent in determining whether plaintiff adduced sufficient evidence to establish the intent element.

■    We turn next to plaintiff's contention that defendant failed to preserve the issue of the reasonableness of her emotional response. In denying defendant's motion for a directed verdict, the trial court did not specifically address the question whether plaintiff's response to defendant's conduct was

need not resolve that issue, because the record does not support the factual premise on which defendant and *amicus* rely—namely, that defendant did not complain to anyone in management. Plaintiff testified, "Probably on a daily basis I talked to Mike Calkins about how I was being treated." Plaintiff described Calkins as her "shift manager." Plaintiff's counsel read into the record testimony that Calkins gave in a prior proceeding, in which he also stated that he was a manager. Thus, there is evidence that plaintiff did indeed complain to management.

objectively reasonable. Rather, it stated only that conflicting testimony raised credibility issues that the jury had to decide. Given that the question whether plaintiff's emotional response was reasonable does not involve any credibility determinations, it appears that the trial court did not address that issue. Thus, the question for us is whether defendant raised the issue with sufficient specificity that the court should have been prompted to address it.

In its trial memorandum, defendant began its analysis of the IIED claim by listing the elements of the tort as follows:

> "Such a claim requires pleading and proof of three elements: (1) that the defendant intended to inflict severe emotional distress on the plaintiff, meaning either that the defendant actually intended the distress or knew that it was substantially certain to occur as a result of the conduct in question; (2) that the conduct did, in fact, cause such severe emotional distress; and (3) that the defendant's conduct involved some extraordinary transgression of the bounds of socially tolerable conduct."

In that statement of the elements, defendant did not assert that the distress must be objectively reasonable. However, in the next paragraph of the memorandum, defendant argued that the conduct described in plaintiff's complaint could not amount to IIED:

> "There is no evidence from which any objectively reasonable juror could infer that this conduct was engaged in with such intent, there is *no evidence a reasonable person would ever suffer such distress from such conduct* and, most importantly, it does not come close to involving 'some extraordinary transgression of the bounds of socially tolerable conduct' * * *."

(Emphasis added.) In its initial motion for directed verdict, at the close of plaintiff's case-in-chief, defendant argued that its alleged misconduct did not amount to intentional infliction of severe emotional distress, asserting, "It was clear, I think, from [plaintiff's] testimony and her comments on cross examination that this is the product of a huge emotional overreaction." When it renewed the motion at the close of all the evidence, defendant argued, "There is a large area where

human beings and differences in personality and differences in sensitivity that make somebody else uncomfortable is not actionable. And that's what this case is."

Taking all of those statements by defendant together, we conclude that defendant identified its position with sufficient clarity to preserve it for appeal. Particularly given the statement in defendant's trial memorandum that "there is no evidence a reasonable person would ever suffer such distress from such conduct," it was sufficiently clear that, in defendant's view, the law requires that the plaintiff's response be objectively reasonable. Accordingly, we turn to the question whether a "reasonable person" standard applies in determining whether severe emotional distress is actionable.

Defendant contends that, in *Checkley v. Boyd,* 198 Or App 110, 131, 107 P3d 651, *rev den,* 338 Or 538 (2005), we adopted comment j to the *Restatement (Second) of Torts* § 46 (1965), which states, in part,

"The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it. * * *

"The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge."

Plaintiff contends that our reference to comment j in *Checkley* was *dictum* and that neither we nor the Supreme Court have adopted the comment.

■ We need not determine whether either court has previously adopted comment j or, if we have not, whether we should adopt it now. Assuming, without deciding, that the "distress" element includes a reasonable person standard, we reject defendant's argument that its conduct would not cause a reasonable person to suffer severe emotional distress. Plaintiff worked for defendant for 16 years—virtually all of her adult life—and her ability to continue her job was threatened by a serious injury. She presented evidence that being a productive employee is important to her. She also presented

evidence that her family's financial stability depended on her ability to continue working. In our view, a reasonable person in plaintiff's circumstances could suffer severe emotional distress as a result of defendant's demeaning treatment.

■■    We turn to defendant's argument regarding the first element—intent. Defendant argues that plaintiff failed to establish that any of its conduct was intended to cause severe emotional distress or that defendant knew that its conduct would cause such distress. An intent to inflict distress can reasonably be inferred from much of Marple's conduct, such as calling plaintiff back from a job on the production floor in order to give her a "shameful" job. Moreover, we have previously held that "the requisite intent can be inferred from outrageous conduct," *Buckel v. Nunn*, 133 Or App 399, 404, 891 P2d 16 (1995), and also that intent may be inferred from the extent of the conduct, *Mains v. II Morrow, Inc.*, 128 Or App 625, 630-31, 877 P2d 88 (1994). In this case, evidence in the record describes a course of conduct extending over a five-month period. If the jury could find that defendant's conduct was outrageous, it could properly infer intent to inflict severe emotional distress. Accordingly, we turn to defendant's argument concerning the third element of plaintiff's IIED claim.

■■    Defendant argues that, individually and collectively, the specifications of conduct submitted to the jury fall short of the "outrageous conduct" standard required to support liability for IIED.[4] For purposes of this tort, conduct is outrageous if it is "extraordinarily beyond the bounds of socially tolerable behavior." *House*, 218 Or App at 357. " 'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible

---

[4] In support of its position, defendant points out that the trial court struck plaintiff's claim for punitive damages, a ruling to which plaintiff does not assign error. Defendant argues that there is a nearly complete overlap of the elements that support punitive damages and the elements of IIED. Accordingly, defendant contends, the inability of plaintiff's evidence to support punitive damages in the eyes of the trial court strongly suggests that the court erred in denying the motion for a directed verdict on the IIED claim. We disagree. To be sure, in the face of seemingly inconsistent rulings, it is reasonable to assume that one of the rulings is incorrect. However, the fact that one of the rulings is not challenged on appeal does not bear on the correctness of the other ruling. We therefore do not consider the trial court's ruling on the punitive damages claim in analyzing plaintiff's IIED claim.

bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* at 358 (quoting *Restatement (Second) of Torts* § 46 comment d (1965)). Conduct that is "rude, boorish, tyrannical, churlish and mean" does not support liability for IIED. *Kraemer v. Harding*, 159 Or App 90, 110, 976 P2d 1160, *rev den*, 329 Or 357 (1999) (internal quotation marks omitted). Whether conduct is an extraordinary transgression is a fact-specific inquiry, based on the totality of the circumstances. *House*, 218 Or App at 358. The totality of the circumstances includes the conduct itself as well as any special relationship of the parties, characteristics of the plaintiff that were known to the defendant, and the setting in which the conduct occurred. *Id.* at 360.

> "The most important factor is whether a special relationship exists between a plaintiff and a defendant, such as an employer-employee, physician-patient, counselor-client, landlord-tenant, debtor-creditor or government officer-citizen, that shapes the interpersonal dynamics of the parties. A defendant's relationship to the plaintiff may be one that 'imposes on the defendant a greater obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in arm's-length encounters among strangers.'"

*Id.* (quoting *McGanty v. Staudenraus*, 321 Or 532, 547-48, 901 P2d 841 (1995)). The fact that conduct occurs in an employment context also bears on the degree of its offensiveness. *Id.*

Plaintiff contends that another factor in the totality of the circumstances is her status as an injured worker. Defendant disputes that contention, arguing that a claim for IIED motivated by injured worker animus is not separately actionable from a claim for workers' compensation discrimination under ORS 659A.040 to 659A.046. Defendant contends that those statutes provide the exclusive remedy for claims arising from a plaintiff's status as an injured worker and, thus, that the jury could not consider that status with respect to the IIED claim in this case.

That is incorrect. ORS 659A.040 provides a remedy for discrimination against a worker "because the worker has

applied for benefits or invoked or utilized the procedures provided for in [the workers' compensation statutes] or has given testimony under the provisions of those laws." ORS 659A.043 and ORS 659A.046 provide remedies for failure to reinstate or reemploy a worker who has sustained a compensable injury. Those statutes do not provide a remedy for all tortious conduct that is motivated by the fact that a worker is injured. In particular, as pertinent here, the statutes do not provide a remedy if an employer reinstates an injured worker and then inflicts emotional distress on the worker, not based on the fact that she filed a workers' compensation claim, but simply because she is injured. Because those statutes do not provide an adequate remedy for such conduct, they do not preclude consideration of that status in common-law claims for IIED. *Cf. Crosby v. SAIF*, 73 Or App 372, 374-75, 699 P2d 198 (1985) (ORS 659A.040 (then numbered ORS 659.410) did not preclude a common-law civil conspiracy claim alleging that the defendants conspired to divest the plaintiff of his right to workers' compensation benefits, because the alleged conduct went beyond what is proscribed by the statute); *see also Olsen v. Deschutes County*, 204 Or App 7, 16, 127 P3d 655 (2005), *rev den*, 341 Or 80 (2006) (ORS 659A.040 precludes common-law actions based on retaliation for filing workers' compensation claims).

Defendant argues that we should not consider plaintiff's status as an injured worker for a second reason. According to defendant, because the jury returned the verdict in its favor on plaintiff's discrimination claim, we must conclude that the jury found that none of defendant's conduct was motivated by plaintiff's injured status. That is also incorrect. In considering plaintiff's discrimination claim, the jury was not asked to determine whether defendant's conduct was motivated by the fact that plaintiff was injured. The trial court instructed the jury that, to prevail on that claim, plaintiff had to prove that defendant treated plaintiff as it did "because she applied for benefits or used the procedures of the Workers' Compensation system[.]" We reject defendant's argument without further discussion.

Defendant does not challenge plaintiff's basic proposition—namely, that some conduct by an employer that might otherwise be tolerable is intolerable if directed at a

worker known to be injured—and with good reason. It is unremarkable to conclude that calling an injured worker "worthless," for example, is less tolerable in a civilized community than calling a noninjured worker the same thing. Thus, we conclude that plaintiff's status as an injured worker is part of the totality of the circumstances that we must consider in determining whether a reasonable jury could find that defendant's conduct was outrageous.

Viewing the evidence in the light of the parties' 16-year employer-employee relationship and plaintiff's status as an injured worker, we conclude that a reasonable jury could find that defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *House*, 218 Or App at 358 (internal quotation marks omitted). Taken individually, the acts that Marple, Rasumssen, and Houghton engaged in might not cross the line, but, given the repetitive nature of the conduct and its duration, a jury could find it as a whole to be intolerable. Of particular importance is the fact that, after five months of persistent and pervasive demeaning treatment by Marple and, to a lesser extent, Rasmussen, plaintiff went to Houghton, defendant's human resources manager, and told her what she had been enduring, only to have her essentially ratify the conduct by again calling plaintiff "worthless."

In short, the trial court did not err in concluding that plaintiff adduced sufficient evidence to send her IIED claim to the jury.

Affirmed.